# **EXHIBIT A**

Overwatch Unsecured Notes to Colepin ATF Barrett and Sons Trading Co Superfund

## PROMISSORY NOTE AND WARRANT PURCHASE AGREEMENT

This Promissory Note and Warrant Purchase Agreement (this "Agreement") is made and entered into as of November 04, 2019 ("Effective Date") by and between Overwatch Digital Health, Inc., a Texas corporation ("Company"), and Colepin ATF Barrett and Sons Trading Co Super Fund ("Purchaser").

WHEREAS, the Company desires to sell to the Purchaser, and the Purchaser desires to purchase from the Company, a promissory note in the principal amount of $200,000.00 (USD) ("Investment") in the form attached hereto as Exhibit A ("Note") and with such maturity dates set forth in the Note.

WHEREAS, as an inducement for the Purchaser to enter into this Agreement, the Company shall grant to the Purchaser on the date of this Agreement a warrant to purchase shares of the Company's common stock ("Warrant Shares",); all Warrant Shares have an exercise price of $1.56 ("Exercise Price") and are exercisable for a term of five years by cash exercise only. The form of warrant is attached hereto as Exhibit B ("Warrant").

NOW, THEREFORE, in consideration of the foregoing recitals and the representations, and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      PURCHASE AND SALE OF NOTES; GRANT OF WARRANTS.

        (a) Purchase and Sale of Note. Simultaneously with the execution and delivery of this Agreement, the Purchaser shall deliver the Investment to the Company against delivery of the Note to the Purchaser by the Company.

        (b) Grant of Warrants. On the date of this Agreement, the Company shall grant to the Purchaser, and the Purchaser shall accept from the Company, the Warrant.

2.      CLOSING DATE. The closing of the purchase and sale of the Note shall take place on the Effective Date.

3.      REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company hereby represents and warrants to the Purchaser, as of the date hereof:

        (a) Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas and has all corporate power and authority required to (i) carry on its business as currently conducted and as proposed to be conducted by the Company and (ii) enter into this Agreement, the Note and the Warrant and consummate the transactions contemplated hereby and thereby. The Company is qualified to do business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on the Company. As used in this Agreement, "Material Adverse Effect" means a material adverse change in, or a series of events which, in the aggregate, has a material adverse effect on or change in, the business, financial condition, operations, assets or liabilities of the Company.

        (b) Due Authorization. All corporate action on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all obligations of the Company under, this Agreement, the Note and the Warrant has been taken, and this Agreement, the Note and the Warrant constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their terms, except (i) as may be limited by (A) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally and (B) the effects of rules of law governing the availability of equitable remedies and (ii) as rights to indemnity or contribution may be limited under federal or state securities laws or by principles of public policy thereunder.

        (c) Valid Issuance of Stock.

1

(i) Valid Issuance. The Warrant Shares have been duly and validly reserved for issuance and, upon issuance, sale and delivery in accordance with the terms of the Warrant, will be duly and validly issued, fully paid, non-assessable and free of preemptive rights binding on the Company.

(ii) Compliance with Securities Laws. The Note and Warrant will be issued to the Purchaser in compliance with applicable exemptions from the registration, prospectus delivery requirements and qualification requirements of all applicable securities laws of the states of the United States.

(d) Non-Contravention. The execution, delivery and performance by the Company of this Agreement, the Note and the Warrant, and the consummation by the Company of the transactions contemplated hereby and thereby, do not: (i) contravene or conflict with the Company's Certificate of Incorporation or the Company's By-Laws; (ii) constitute a violation of any provision of any federal, state, local or foreign law or rule, regulation or requirement binding upon or applicable to the Company; or (iii) constitute a default or require any consent under, give rise to any right of termination, cancellation or acceleration of, or to a loss of any benefit to which the Company is entitled under, or result in the creation or imposition of any lien, claim or encumbrance on any assets of the Company, except any such default, consent, right of termination, cancellation or acceleration, loss or lien, claim or encumbrance which, individually or in the aggregate, would not have a Material Adverse Effect on the Company.

(e) Litigation. There is no action, suit, proceeding, claim, arbitration or investigation pending or, to the Company's best knowledge, threatened: (i) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries in connection with such officer's, director's or employee's relationship with, or actions taken on behalf of, the Company or such subsidiary; or (ii) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries that seeks to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement.

4.       REPRESENTATIONS AND WARRANTIES OF THE PURCHASER. The Purchaser hereby represents and warrants to the Company, as of the date hereof, that:

(a) Investment Experience. The Purchaser understands that the acquisition of the Note and Warrant Shares involves substantial risk. The Purchaser has experience as an Purchaser in securities of companies and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment and protecting its own interests in connection with this investment.

(b) Accredited Purchaser Status. The Purchaser is an "accredited Purchaser" within the meaning of Regulation D promulgated under the Securities Act.

5.       ADJUSTMENT AND RECLASSIFICATION PROVISIONS.

(a) Reorganization, Reclassification or Recapitalization of the Company. In case of (i) a capital reorganization, reclassification or recapitalization of the Warrant Shares (other than in the cases referred to in Section 3(c) hereof), (ii) the Company's consolidation or merger with or into another corporation in which the Company is not the surviving entity, or a merger in which the Company is the surviving entity but the Warrant Shares outstanding immediately prior to the merger are converted, by virtue of the merger, into other property, whether in the form of securities, cash or otherwise, or (iii) the sale or transfer of all or substantially all of the Company's assets, then, as part of such reorganization, reclassification, recapitalization, merger, consolidation, sale or transfer, lawful provision shall be made so that there shall thereafter be deliverable upon the exercise of the Warrant or any portion thereof (in lieu of or in addition to the number of Warrant Shares theretofore deliverable, as appropriate) and without payment of any additional consideration, the number of shares of stock or other securities of property to which the holder of the number of Warrant Shares which would otherwise have been deliverable upon the exercise of the Warrant or any portion thereof at the time of such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer would have been entitled to receive in such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer. This Section 5(a) shall apply to successive reorganizations, reclassifications, recapitalizations, consolidations, mergers, sales and transfers and to the stock or securities of any other corporation that are at the time

2

receivable upon the exercise of the Warrant or any portion thereof. If the per share consideration payable to the Purchaser for Warrant Shares in connection with any transaction described in this Section 5(a) is in a form other than cash or marketable securities, then the value of such consideration shall be determined in good faith by the Company's Board of Directors.

(b) Splits and Combinations. If the Company at any time or from time to time after the date of the Agreement subdivides any of its outstanding Warrant Shares into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and, conversely, if the outstanding Warrant Shares are combined into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased.

(c) Reclassifications. If the Company reclassifies or otherwise changes any of the Warrant Shares into the same or a different number of securities of any other class or classes, the Warrant Shares shall thereafter be convertible into such number and kind of securities as would have been issuable as the result of such change with respect to the Warrant Shares immediately prior to such reclassification or other change and the Exercise Price therefore shall be appropriately adjusted.

(d) Liquidation; Dissolution. If the Company shall dissolve, liquidate or wind up its affairs, the Purchaser shall have the right, but not the obligation, to convert the Note and exercise the Warrant effective as of the date of such dissolution, liquidation or winding up.

(c) Adjustment Certificates. Upon any adjustment of the purchase price or the number of Warrant Shares issuable upon exercise or conversion, a certificate, signed by (i) the Company's Chief Financial Officer or (ii) any independent firm of certified public accountants of recognized national standing the Company selects at its own expense, setting forth in reasonable detail the events requiring the adjustment and the method by which such adjustment was calculated, shall be mailed to the Purchaser at the address set forth in Section 6 hereof and shall specify such adjustments.

(f) No Impairment. The Company shall not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms hereunder by the Company, but shall at all times in good faith assist in the carrying out of all provisions of this Agreement and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Purchaser against impairment.

6.      MISCELLANEOUS.

(a) Governing Law. This Agreement shall be governed by and construed under the internal laws of the State of Texas, without reference to principles of conflict of laws or choice of laws.

(b) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(c) Amendments and Waivers. This Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchaser.

(d) Severability. If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e) Entire Agreement. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**OVERWATCH DIGITAL HEALTH, INC.**

*Terry Fokas*

Terry Fokas
Chief Executive Officer

**COLEPIN ATF BARRETT AND SONS TRADING CO SUPER FUND**

_____

Name: Clive Barrett
Address: c/o Quantum Partners, Level 1, 95-97 Grafton Street Bondi Junction NSW 2022 Australia

## EXHIBIT A

## PROMISSORY NOTE

## OVERWATCH DIGITAL HEALTH, INC.

10% Promissory Note

Maturity Date: December 04, 2019 or April 04, 2020

This Promissory Note is being delivered pursuant to that certain Promissory Note and Warrant Purchase Agreement, dated as of November 04, 2019, between the Purchaser and the Company (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

FOR VALUE RECEIVED, the Company promises to pay to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before December 04, 2019 ("First Maturity Date") or on or before April 04, 2020 ("Second Maturity Date"), as the case may be. In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the First Maturity Date, interest on the outstanding Investment shall accrue at a rate of 10.0% per annum ("First Interest Rate"). In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the Second Maturity Date interest on the outstanding Investment shall accrue at a rate of 20.0% per annum ("Second Interest Rate"). Payment of the Investment together with accrued but unpaid interest thereon shall be paid on or before either the First Maturity Date or the Second Maturity Date in the sole discretion of the Company.

If all or a portion of the Investment and/or the First Interest Rate or the Second Interest Rate, as the case may be, is not paid when due (either at the First Maturity Date or the Second Maturity Date), the Company hereby promises to pay, on demand, interest on such overdue amount from and including the due date to, but excluding, the date such amount is paid in full at 25% per annum (and until the date such overdue amount is paid in full, interest on such overdue amount shall mean interest at such rate).

1.      Payment.

(a) Payment of the Investment and the First Interest Rate or the Second Interest Rate, as the case may be, when due (either at the First Maturity Date or the Second Maturity Date) shall be made by certified or bank cashier's check payable to the Purchaser, or by bank wire transfer, in immediately available funds, to the account so specified, in lawful money of the United States of America. If the maturity date occurs on a date that is not a Business Day then the Investment or interest then due shall be paid on the next succeeding Business Day. "Business Day" shall mean any day other than Saturday, Sunday or any day upon which banks are authorized or required to be closed.

(b) Prepayment. The Company may prepay and the holder may request prepayment of this Note at any time without premium or penalty, in whole or in part, with accrued interest to the date of such payment on the amount prepaid.

(c) Application of Payments. Payments made in connection with this Note shall be applied first to amounts due hereunder and thereafter to the First Interest Rate or Second Interest Rate interest and finally to the Investment.

2.      Default and Remedies.

(a) If any of the following events or conditions (each an "Event of Default") shall occur and be continuing:

(i) The Company shall fail to pay the Investment and any interest due 30 days subsequent to the the First Maturity Date or the Second Maturity Date, as the case may be;

(ii) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of the Company, or of a substantial part of the property or assets of the Company, under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) the appointment of a receiver, trustee, custodian, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company or (C) the winding-up, liquidation or dissolution of the Company; and such proceeding or petition shall continue undismissed for 90 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(iii) the Company (A) voluntarily commences any proceeding or files any petition seeking relief under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) consents to, or fails to contest in a timely and appropriate manner, the commencement against of any proceeding or the filing of any petition described in clause (ii) above, (C) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment for the benefit of creditors, (F) becomes unable, admits in writing its inability or fails generally to pay its debts as they become due or (G) takes any action for the purpose of effecting any of the foregoing; then, (x) in the case of an Event of Default specified in clause (a)(i) or (ii) above, the Purchaser may, at any time during the continuance of such Event of Default, by written notice to the Company, declare the entire outstanding Investment, together with all accrued and unpaid interest, to be due and payable and (y) in the case of an Event of Default specified in clauses (a)(i), (ii), or (iii) above, the entire outstanding Investment, together with all accrued and unpaid interest, shall automatically forthwith become due and payable without presentment, protest or notice of any kind, all of which are hereby expressly waived by the Company.

(b) Subject to the other terms of this Note, if an Event of Default occurs and is continuing, the Purchaser may pursue any available remedy to collect the payment of the Investment or interest or to enforce the performance of any provision of this Note. If an Event of Default occurs and is continuing, the Purchaser may proceed to protect and enforce its rights by any action at law, suit in equity or other appropriate proceeding. In the case of a default in the payment of the Investment or Interest, the Company will pay to the Purchaser such further amount as shall be sufficient to cover the costs and expenses of collection, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

(c) Default Interest. If an Event of Default occurs, the Interest will increase to 25% per annum subsequent to the date of Event of Default.

3.       Notices

All notices and other communications in connection herewith shall be in writing and be sent to:

If to the Company to:   Overwatch Digital Health, Inc.
                        17440 Dallas Parkway, Suite 230
                        Dallas, TX 75287
                        Attention: Chief Executive Officer

If to the Purchaser to:  As written on signatory page of the Agreement

4.       Miscellaneous.

This Note shall be construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of laws rules. The Company waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default and enforcement of this Note. The Company hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the courts of the State of Texas and of the United States District Court for the Eastern District of Texas, and any appellate court of such courts, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and the Company hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas court (or, to the extent permitted by law, in such federal court). The Company agrees that a final, unappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Purchaser may otherwise have to bring any action or proceeding relating to this Note against the Company or its properties in the courts of any jurisdiction.

If any provision of this Note shall be held invalid or unenforceable by any court of competent jurisdiction, that holding shall not invalidate or render unenforceable any other provision hereof.

This Note may not be changed, amended or modified except by agreement in writing signed by the Company and the Purchaser.

IN WITNESS WHEREOF, the Company has caused this Note to be signed on its behalf, in its corporate name, by its duly authorized officer as an instrument under seal, as of November 04, 2019.

OVERWATCH DIGITAL HEALTH, INC.

*Terry Fokas*

Terry Fokas
Chief Executive Officer

## EXHIBIT B

## OVERWATCH DIGITAL HEALTH, INC.

## COMMON STOCK WARRANT

Issued: November 04, 2019

Warrant to Purchase Shares of Common Stock

Expiration Date: November 04, 2024

Overwatch Digital Health, Inc. ("Company"), hereby certifies that, for value received, Colepin ATF Barrett and Sons Trading Co Super Fund ("Purchaser") is entitled, on the terms set forth below, to purchase any time until 5:00 p.m., Central Time, on the Expiration Date the following fully paid and nonassessable shares of the Common Stock of the Company, at a price per share of $1.56 (the "Purchase Price" – as subject to adjustment pursuant to Section 5 of the Promissory Note and Warrant Purchase Agreement by and among the Company and Purchaser): (a) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before December 04, 2019 ("First Maturity Date") Purchaser may purchase at the Purchase Price up to $20,000 in Warrant Shares; (b) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before April 04, 2020 ("Second Maturity Date") Purchaser may purchase at the Purchase Price up to $30,000 in Warrant Shares; or (c) If all of the Investment and the interest, is not paid when due (either at the First Maturity Date or the Second Maturity Date), Purchaser may purchase at the Purchase Price up to $50,000 in Warrant Shares.

This Warrant is being issued pursuant to the Promissory Note and Warrant Agreement dated November 04, 2019 between the Company and Purchaser (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

1.     Exercise of Warrant; Transfer of Warrant.

(a) Exercise of Warrant. At any time prior to 5:00 p.m. on the Expiration Date, the Warrant may be exercised by the Purchaser, by surrendering this Warrant to the Company, together with an executed Notice of Exercise, substantially in the form attached hereto as Exhibit 1, at the Company's primary executive office, with payment by check to the Company of the amount obtained by multiplying the number of shares of Common Stock with respect to which this Warrant is being exercised by the Purchase Price. No partial exercise of the Warrant is allowed.

(b) Fractional Shares. No fractional shares of Common Stock shall be issued upon any exercise or conversion of this Warrant. Instead of any fractional share which would otherwise be issuable upon exercise or conversion, the Company shall pay a cash amount in respect of each fractional share at a price equal to an amount calculated by multiplying such fractional share (calculated to the nearest 1/100th of a share) by the Fair Market Value of a share of Common Stock on the date of exercise or conversion, as applicable, minus the Purchase Price. Payment of such amount shall be made in cash or by check payable to the order of the Purchaser at the time of delivery of any certificate or certificates arising upon such exercise or conversion.

(c) Taxes. The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Common Stock in any name other than that of the Purchaser hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or Warrant until such tax is paid.

(d) Transfer of Warrant. Transfer of this Warrant to a third party shall be effected by execution and delivery of the Notice of Assignment attached hereto as Exhibit 2 and surrender of this Warrant for registration of transfer of this Warrant at the primary executive office of the Company, together with funds sufficient to pay any applicable transfer tax. Upon receipt of the duly executed Notice of Assignment and the necessary transfer tax funds,

if any, the Company, at its expense, shall execute and deliver, in the name of the designated transferee or transferees, one or more new Warrants representing the right to purchase a like aggregate number of shares of Common Stock.

2.       Notices of Record Date. In case (a) the Company takes a record of holder of Common Stock for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; (b) of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation, or any conveyance of all or substantially all of the assets of the Company to another corporation; or (c) of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail to each holder of a Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the Purchasers of record of Common Stock (or such other stock or securities at the time receivable upon the exercise or conversion of the Warrant) will be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up. Such notice shall be mailed at least ten days prior to the date specified therein.

4.       Replacement of Warrant. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement.

5.       Transferability of Warrant; No Redemption. This Warrant and all rights hereunder are freely transferable by the Purchaser, subject to compliance with applicable state and federal securities laws. This Warrant shall not be redeemable by the Company, in whole or in part, at any time.

6.       Notices. All notices and other communications given hereunder shall be sent to:

If to the Company to:  Overwatch Digital Health, Inc.
                       17440 Dallas Parkway, Suite 230
                       Dallas, TX 75287
                       Attention: Chief Executive Officer

If to the Purchaser to:  As written on signatory page of the Agreement

7.       Change; Amendment or Wavier. This Warrant may not be changed, amended or modified except by written agreement of the Company and the Purchaser.

8.       Governing Law. This Warrant shall be construed in accordance with and governed by the laws of Texas without regard to its conflicts of laws rules.

Dated: November 04, 2019

                                        **OVERWATCH DIGITAL HEALTH, INC.**


                                        *Terry Fokas*
                                        Terry Fokas
                                        Chief Executive Officer

**EXHIBIT 1**

**NOTICE OF EXERCISE OF WARRANT**

TO: Overwatch Digital Health, Inc.

1.      The undersigned hereby elects to receive_____shares of Common Stock of Overwatch Digital Health, Inc., pursuant to the terms of the attached Warrant.

2.      Exercise. The undersigned tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.

3.      Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____

_____
(Address)

4.      All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Warrant.

_____
Name of Purchaser

_____
Signature of Authorized Signatory

_____
Print Name and Title

_____
Date

## EXHIBIT 2

**WARRANT ASSIGNMENT FORM**

(To be executed only upon the assignment of the within Warrant)

FOR VALUE RECEIVED, the undersigned registered Purchaser of the within Warrant hereby sells, assigns and transfers unto_____, whose address is_____all of the rights of the undersigned under the within Warrant, with respect to shares of Common Stock (as defined within the Warrant) of Overwatch Digital Health, Inc., and, if such shares of Common Stock shall not include all the shares of Common Stock issuable as provided in the within Warrant, that a new Warrant of like tenor for the number of shares of Common Stock not being transferred hereunder be issued in the name of and delivered to the undersigned, and does hereby irrevocably constitute and appoint_____attorney to register such transfer on the books of Overwatch Digital Health, Inc. maintained for that purpose, with full power of substitution in the premises.

Dated: _____

By:_____
(Signature of Registered Purchaser)

Title: _____

NOTICE: The signature to this Notice of Assignment must correspond with the name upon the face of the within Warrant in every particular, without alteration or enlargement or any change whatever.

11

**PROMISSORY NOTE AND WARRANT PURCHASE AGREEMENT**

This Promissory Note and Warrant Purchase Agreement (this "Agreement") is made and entered into as of December 02, 2019 ("Effective Date") by and between Overwatch Digital Health, Inc., a Texas corporation ("Company"), and Colepin ATF Barrett and Sons Trading Co Super Fund ("Purchaser").

WHEREAS, the Company desires to sell to the Purchaser, and the Purchaser desires to purchase from the Company, a promissory note in the principal amount of $200,000.00 (USD) ("Investment") in the form attached hereto as <u>Exhibit A</u> ("Note") and with such maturity dates set forth in the Note.

WHEREAS, as an inducement for the Purchaser to enter into this Agreement, the Company shall grant to the Purchaser on the date of this Agreement a warrant to purchase shares of the Company's common stock ("Warrant Shares",); all Warrant Shares have an exercise price of $1.56 ("Exercise Price") and are exercisable for a term of five years by cash exercise only. The form of warrant is attached hereto as <u>Exhibit B</u> ("Warrant").

NOW, THEREFORE, in consideration of the foregoing recitals and the representations, and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    PURCHASE AND SALE OF NOTES; GRANT OF WARRANTS.

    (a) Purchase and Sale of Note. Simultaneously with the execution and delivery of this Agreement, the Purchaser shall deliver the Investment to the Company against delivery of the Note to the Purchaser by the Company.

    (b) Grant of Warrants. On the date of this Agreement, the Company shall grant to the Purchaser, and the Purchaser shall accept from the Company, the Warrant.

2.    CLOSING DATE. The closing of the purchase and sale of the Note shall take place on the Effective Date.

3.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company hereby represents and warrants to the Purchaser, as of the date hereof:

    (a) Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas and has all corporate power and authority required to (i) carry on its business as currently conducted and as proposed to be conducted by the Company and (ii) enter into this Agreement, the Note and the Warrant and consummate the transactions contemplated hereby and thereby. The Company is qualified to do business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on the Company. As used in this Agreement, "Material Adverse Effect" means a material adverse change in, or a series of events which, in the aggregate, has a material adverse effect on or change in, the business, financial condition, operations, assets or liabilities of the Company.

    (b) Due Authorization. All corporate action on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all obligations of the Company under, this Agreement, the Note and the Warrant has been taken, and this Agreement, the Note and the Warrant constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their terms, except (i) as may be limited by (A) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally and (B) the effects of rules of law governing the availability of equitable remedies and (ii) as rights to indemnity or contribution may be limited under federal or state securities laws or by principles of public policy thereunder.

    (c) Valid Issuance of Stock.

(i) Valid Issuance. The Warrant Shares have been duly and validly reserved for issuance and, upon issuance, sale and delivery in accordance with the terms of the Warrant, will be duly and validly issued, fully paid, non-assessable and free of preemptive rights binding on the Company.

(ii) Compliance with Securities Laws. The Note and Warrant will be issued to the Purchaser in compliance with applicable exemptions from the registration, prospectus delivery requirements and qualification requirements of all applicable securities laws of the states of the United States.

(d) Non-Contravention. The execution, delivery and performance by the Company of this Agreement, the Note and the Warrant, and the consummation by the Company of the transactions contemplated hereby and thereby, do not: (i) contravene or conflict with the Company's Certificate of Incorporation or the Company's By-Laws; (ii) constitute a violation of any provision of any federal, state, local or foreign law or rule, regulation or requirement binding upon or applicable to the Company; or (iii) constitute a default or require any consent under, give rise to any right of termination, cancellation or acceleration of, or to a loss of any benefit to which the Company is entitled under, or result in the creation or imposition of any lien, claim or encumbrance on any assets of the Company, except any such default, consent, right of termination, cancellation or acceleration, loss or lien, claim or encumbrance which, individually or in the aggregate, would not have a Material Adverse Effect on the Company.

(e) Litigation. There is no action, suit, proceeding, claim, arbitration or investigation pending or, to the Company's best knowledge, threatened: (i) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries in connection with such officer's, director's or employee's relationship with, or actions taken on behalf of, the Company or such subsidiary; or (ii) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries that seeks to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement.

4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER. The Purchaser hereby represents and warrants to the Company, as of the date hereof, that:

(a) Investment Experience. The Purchaser understands that the acquisition of the Note and Warrant Shares involves substantial risk. The Purchaser has experience as an Purchaser in securities of companies and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment and protecting its own interests in connection with this investment.

(b) Accredited Purchaser Status. The Purchaser is an "accredited Purchaser" within the meaning of Regulation D promulgated under the Securities Act.

5.    ADJUSTMENT AND RECLASSIFICATION PROVISIONS.

(a) Reorganization, Reclassification or Recapitalization of the Company. In case of (i) a capital reorganization, reclassification or recapitalization of the Warrant Shares (other than in the cases referred to in Section 3(c) hereof), (ii) the Company's consolidation or merger with or into another corporation in which the Company is not the surviving entity, or a merger in which the Company is the surviving entity but the Warrant Shares outstanding immediately prior to the merger are converted, by virtue of the merger, into other property, whether in the form of securities, cash or otherwise, or (iii) the sale or transfer of all or substantially all of the Company's assets, then, as part of such reorganization, reclassification, recapitalization, merger, consolidation, sale or transfer, lawful provision shall be made so that there shall thereafter be deliverable upon the exercise of the Warrant or any portion thereof (in lieu of or in addition to the number of Warrant Shares theretofore deliverable, as appropriate) and without payment of any additional consideration, the number of shares of stock or other securities of property to which the holder of the number of Warrant Shares which would otherwise have been deliverable upon the exercise of the Warrant or any portion thereof at the time of such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer would have been entitled to receive in such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer. This Section 5(a) shall apply to successive reorganizations, reclassifications, recapitalizations, consolidations, mergers, sales and transfers and to the stock or securities of any other corporation that are at the time

receivable upon the exercise of the Warrant or any portion thereof. If the per share consideration payable to the Purchaser for Warrant Shares in connection with any transaction described in this Section 5(a) is in a form other than cash or marketable securities, then the value of such consideration shall be determined in good faith by the Company's Board of Directors.

(b) Splits and Combinations. If the Company at any time or from time to time after the date of the Agreement subdivides any of its outstanding Warrant Shares into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and, conversely, if the outstanding Warrant Shares are combined into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased.

(c) Reclassifications. If the Company reclassifies or otherwise changes any of the Warrant Shares into the same or a different number of securities of any other class or classes, the Warrant Shares shall thereafter be convertible into such number and kind of securities as would have been issuable as the result of such change with respect to the Warrant Shares immediately prior to such reclassification or other change and the Exercise Price therefore shall be appropriately adjusted.

(d) Liquidation; Dissolution. If the Company shall dissolve, liquidate or wind up its affairs, the Purchaser shall have the right, but not the obligation, to convert the Note and exercise the Warrant effective as of the date of such dissolution, liquidation or winding up.

(c) Adjustment Certificates. Upon any adjustment of the purchase price or the number of Warrant Shares issuable upon exercise or conversion, a certificate, signed by (i) the Company's Chief Financial Officer or (ii) any independent firm of certified public accountants of recognized national standing the Company selects at its own expense, setting forth in reasonable detail the events requiring the adjustment and the method by which such adjustment was calculated, shall be mailed to the Purchaser at the address set forth in Section 6 hereof and shall specify such adjustments.

(f) No Impairment. The Company shall not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms hereunder by the Company, but shall at all times in good faith assist in the carrying out of all provisions of this Agreement and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Purchaser against impairment.

6.      MISCELLANEOUS.

(a) Governing Law. This Agreement shall be governed by and construed under the internal laws of the State of Texas, without reference to principles of conflict of laws or choice of laws.

(b) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(c) Amendments and Waivers. This Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchaser.

(d) Severability. If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e) Entire Agreement. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**OVERWATCH DIGITAL HEALTH, INC.**

*Terry Fokas*

Terry Fokas
Chief Executive Officer

**COLEPIN ATF BARRETT AND SONS TRADING CO SUPER FUND**

_____

Name: Clive Barrett
Address: c/o Quantum Partners, Level 1, 95-97 Grafton Street Bondi Junction NSW 2022 Australia

**<u>EXHIBIT A</u>**

**PROMISSORY NOTE**

**OVERWATCH DIGITAL HEALTH, INC.**

10% Promissory Note

Maturity Date: January 02, 2019 or April 04, 2020

This Promissory Note is being delivered pursuant to that certain Promissory Note and Warrant Purchase Agreement, dated as of December 02, 2019, between the Purchaser and the Company (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

FOR VALUE RECEIVED, the Company promises to pay to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before January 02, 2019 ("First Maturity Date") or on or before April 04, 2020 ("Second Maturity Date"), as the case may be. In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the First Maturity Date, interest on the outstanding Investment shall accrue at a rate of 10.0% per annum ("First Interest Rate"). In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the Second Maturity Date interest on the outstanding Investment shall accrue at a rate of 20.0% per annum ("Second Interest Rate"). Payment of the Investment together with accrued but unpaid interest thereon shall be paid on or before either the First Maturity Date or the Second Maturity Date in the sole discretion of the Company.

If all or a portion of the Investment and/or the First Interest Rate or the Second Interest Rate, as the case may be, is not paid when due (either at the First Maturity Date or the Second Maturity Date), the Company hereby promises to pay, on demand, interest on such overdue amount from and including the due date to, but excluding, the date such amount is paid in full at 25% per annum (and until the date such overdue amount is paid in full, interest on such overdue amount shall mean interest at such rate).

1.     Payment.

(a) Payment of the Investment and the First Interest Rate or the Second Interest Rate, as the case may be, when due (either at the First Maturity Date or the Second Maturity Date) shall be made by certified or bank cashier's check payable to the Purchaser, or by bank wire transfer, in immediately available funds, to the account so specified, in lawful money of the United States of America. If the maturity date occurs on a date that is not a Business Day then the Investment or interest then due shall be paid on the next succeeding Business Day. "Business Day" shall mean any day other than Saturday, Sunday or any day upon which banks are authorized or required to be closed.

(b) Prepayment. The Company may prepay and the holder may request prepayment of this Note at any time without premium or penalty, in whole or in part, with accrued interest to the date of such payment on the amount prepaid.

(c) Application of Payments. Payments made in connection with this Note shall be applied first to amounts due hereunder and thereafter to the First Interest Rate or Second Interest Rate interest and finally to the Investment.

2.     Default and Remedies.

(a) If any of the following events or conditions (each an "Event of Default") shall occur and be continuing:

(i) The Company shall fail to pay the Investment and any interest due 30 days subsequent to the the First Maturity Date or the Second Maturity Date, as the case may be;

(ii) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of the Company, or of a substantial part of the property or assets of the Company, under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) the appointment of a receiver, trustee, custodian, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company or (C) the winding-up, liquidation or dissolution of the Company; and such proceeding or petition shall continue undismissed for 90 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(iii) the Company (A) voluntarily commences any proceeding or files any petition seeking relief under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) consents to, or fails to contest in a timely and appropriate manner, the commencement against of any proceeding or the filing of any petition described in clause (ii) above, (C) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment for the benefit of creditors, (F) becomes unable, admits in writing its inability or fails generally to pay its debts as they become due or (G) takes any action for the purpose of effecting any of the foregoing; then, (x) in the case of an Event of Default specified in clause (a)(i) or (ii) above, the Purchaser may, at any time during the continuance of such Event of Default, by written notice to the Company, declare the entire outstanding Investment, together with all accrued and unpaid interest, to be due and payable and (y) in the case of an Event of Default specified in clauses (a)(i), (ii), or (iii) above, the entire outstanding Investment, together with all accrued and unpaid interest, shall automatically forthwith become due and payable without presentment, protest or notice of any kind, all of which are hereby expressly waived by the Company.

(b) Subject to the other terms of this Note, if an Event of Default occurs and is continuing, the Purchaser may pursue any available remedy to collect the payment of the Investment or interest or to enforce the performance of any provision of this Note. If an Event of Default occurs and is continuing, the Purchaser may proceed to protect and enforce its rights by any action at law, suit in equity or other appropriate proceeding. In the case of a default in the payment of the Investment or Interest, the Company will pay to the Purchaser such further amount as shall be sufficient to cover the costs and expenses of collection, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

(c) Default Interest. If an Event of Default occurs, the Interest will increase to 25% per annum subsequent to the date of Event of Default.

3.      Notices

All notices and other communications in connection herewith shall be in writing and be sent to:

If to the Company to:   Overwatch Digital Health, Inc.
                        17440 Dallas Parkway, Suite 230
                        Dallas, TX 75287
                        Attention: Chief Executive Officer


If to the Purchaser to:  As written on signatory page of the Agreement

4.      Miscellaneous.

This Note shall be construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of laws rules. The Company waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default and enforcement of this Note. The Company hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the courts of the State of Texas and of the United States District Court for the Eastern District of Texas, and any appellate court of such courts, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and the Company hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas court (or, to the extent permitted by law, in such federal court). The Company agrees that a final, unappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Purchaser may otherwise have to bring any action or proceeding relating to this Note against the Company or its properties in the courts of any jurisdiction.

If any provision of this Note shall be held invalid or unenforceable by any court of competent jurisdiction, that holding shall not invalidate or render unenforceable any other provision hereof.

This Note may not be changed, amended or modified except by agreement in writing signed by the Company and the Purchaser.

IN WITNESS WHEREOF, the Company has caused this Note to be signed on its behalf, in its corporate name, by its duly authorized officer as an instrument under seal, as of November 04, 2019.

OVERWATCH DIGITAL HEALTH, INC.

*Terry Fokas*

Terry Fokas
Chief Executive Officer

## EXHIBIT B

## OVERWATCH DIGITAL HEALTH, INC.

## COMMON STOCK WARRANT

Issued: December 02, 2019

Warrant to Purchase Shares of Common Stock

Expiration Date: December 02, 2024

Overwatch Digital Health, Inc. ("Company"), hereby certifies that, for value received, Colepin ATF Barrett and Sons Trading Co Super Fund ("Purchaser") is entitled, on the terms set forth below, to purchase any time until 5:00 p.m., Central Time, on the Expiration Date the following fully paid and nonassessable shares of the Common Stock of the Company, at a price per share of $1.56 (the "Purchase Price" – as subject to adjustment pursuant to Section 5 of the Promissory Note and Warrant Purchase Agreement by and among the Company and Purchaser): (a) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before January 02, 2019 ("First Maturity Date") Purchaser may purchase at the Purchase Price up to $20,000 in Warrant Shares; (b) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before April 04, 2020 ("Second Maturity Date") Purchaser may purchase at the Purchase Price up to $30,000 in Warrant Shares; or (c) If all of the Investment and the interest, is not paid when due (either at the First Maturity Date or the Second Maturity Date), Purchaser may purchase at the Purchase Price up to $50,000 in Warrant Shares.

This Warrant is being issued pursuant to the Promissory Note and Warrant Agreement dated December 02, 2019 between the Company and Purchaser (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

1.      Exercise of Warrant; Transfer of Warrant.

(a) Exercise of Warrant. At any time prior to 5:00 p.m. on the Expiration Date, the Warrant may be exercised by the Purchaser, by surrendering this Warrant to the Company, together with an executed Notice of Exercise, substantially in the form attached hereto as Exhibit 1, at the Company's primary executive office, with payment by check to the Company of the amount obtained by multiplying the number of shares of Common Stock with respect to which this Warrant is being exercised by the Purchase Price. No partial exercise of the Warrant is allowed.

(b) Fractional Shares. No fractional shares of Common Stock shall be issued upon any exercise or conversion of this Warrant. Instead of any fractional share which would otherwise be issuable upon exercise or conversion, the Company shall pay a cash amount in respect of each fractional share at a price equal to an amount calculated by multiplying such fractional share (calculated to the nearest 1/100th of a share) by the Fair Market Value of a share of Common Stock on the date of exercise or conversion, as applicable, minus the Purchase Price. Payment of such amount shall be made in cash or by check payable to the order of the Purchaser at the time of delivery of any certificate or certificates arising upon such exercise or conversion.

(c) Taxes. The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Common Stock in any name other than that of the Purchaser hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or Warrant until such tax is paid.

(d) Transfer of Warrant. Transfer of this Warrant to a third party shall be effected by execution and delivery of the Notice of Assignment attached hereto as Exhibit 2 and surrender of this Warrant for registration of transfer of this Warrant at the primary executive office of the Company, together with funds sufficient to pay any

applicable transfer tax. Upon receipt of the duly executed Notice of Assignment and the necessary transfer tax funds if any, the Company, at its expense, shall execute and deliver, in the name of the designated transferee or transferees, one or more new Warrants representing the right to purchase a like aggregate number of shares of Common Stock.

2.        Notices of Record Date. In case (a) the Company takes a record of holder of Common Stock for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; (b) of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation, or any conveyance of all or substantially all of the assets of the Company to another corporation; or (c) of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail to each holder of a Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the Purchasers of record of Common Stock (or such other stock or securities at the time receivable upon the exercise or conversion of the Warrant) will be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up. Such notice shall be mailed at least ten days prior to the date specified therein.

4.        Replacement of Warrant. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement.

5.        Transferability of Warrant; No Redemption. This Warrant and all rights hereunder are freely transferable by the Purchaser, subject to compliance with applicable state and federal securities laws. This Warrant shall not be redeemable by the Company, in whole or in part, at any time.

6.        Notices. All notices and other communications given hereunder shall be sent to:

If to the Company to:   Overwatch Digital Health, Inc.
                        17440 Dallas Parkway, Suite 230
                        Dallas, TX 75287
                        Attention: Chief Executive Officer

If to the Purchaser to:   As written on signatory page of the Agreement

7.        Change; Amendment or Wavier. This Warrant may not be changed, amended or modified except by written agreement of the Company and the Purchaser.

8.        Governing Law. This Warrant shall be construed in accordance with and governed by the laws of Texas without regard to its conflicts of laws rules.

Dated: December 02, 2019

                              **OVERWATCH DIGITAL HEALTH, INC.**

                              *Terry Fokas*
                              Terry Fokas
                              Chief Executive Officer

9

## EXHIBIT 1

**NOTICE OF EXERCISE OF WARRANT**

TO: Overwatch Digital Health, Inc.

     1.      The undersigned hereby elects to receive_____shares of Common Stock of Overwatch Digital Health, Inc., pursuant to the terms of the attached Warrant.

     2.      Exercise. The undersigned tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.

     3.      Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____
       (Name)

_____

_____
       (Address)

     4.      All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Warrant.

_____
Name of Purchaser

_____
Signature of Authorized Signatory

_____
Print Name and Title

_____
Date

10

## EXHIBIT 2

**WARRANT ASSIGNMENT FORM**

(To be executed only upon the assignment of the within Warrant)

FOR VALUE RECEIVED, the undersigned registered Purchaser of the within Warrant hereby sells, assigns and transfers unto_____, whose address is_____all of the rights of the undersigned under the within Warrant, with respect to shares of Common Stock (as defined within the Warrant) of Overwatch Digital Health, Inc., and, if such shares of Common Stock shall not include all the shares of Common Stock issuable as provided in the within Warrant, that a new Warrant of like tenor for the number of shares of Common Stock not being transferred hereunder be issued in the name of and delivered to the undersigned, and does hereby irrevocably constitute and appoint_____attorney to register such transfer on the books of Overwatch Digital Health, Inc. maintained for that purpose, with full power of substitution in the premises.

Dated: _____

By:_____
(Signature of Registered Purchaser)

Title: _____

NOTICE: The signature to this Notice of Assignment must correspond with the name upon the face of the within Warrant in every particular, without alteration or enlargement or any change whatever.

# **EXHIBIT B**

Overwatch Secured Note to Colepin ATF Barrett and Sons Trading Co Superfund

DocuSign Envelope ID: 21E76454-BB9C-4A6C-A35E-B7AC05C07555

# CONVERTIBLE NOTE DEED

**Overwatch Digital Health, Inc.**
**("Company")**

**Colepin ATF Barrett and Sons Trading Co Super Fund**
**("Investor")**

PHONE  **(61-8) 6211 5000**   |   FAX  **(61-8) 6211 5055**   |   **ABN 83 662 050 668**

POSTAL ADDRESS       PO Box Z5433, St Georges Tce Perth WA 6831

ADDRESS       Level 24 St Martins Tower 44 St Georges Tce
Perth  WA  6000



# Contents

Clause                                                                                                    Page

**1      Interpretation** ................................................................................................. **1**
        1.1     Definitions ........................................................................................... 1
        1.2     Interpretation ...................................................................................... 4
        1.3     Headings .............................................................................................. 5
        1.4     Executed as a deed............................................................................. 5

**2      Issue of Notes** ................................................................................................ **5**
        2.1     Issue of Notes..................................................................................... 5
        2.2     Maximum amount to be raised ......................................................... 5
        2.3     Agreement to subscribe .................................................................... 5
        2.4     Payment and issue ............................................................................. 5

**3      Notes** ............................................................................................................... **6**
        3.1     Interest ................................................................................................. 6
        3.2     Repayment in cash.............................................................................. 6
        3.3     Quotation ............................................................................................. 6
        3.4     Security ................................................................................................. 6
        3.5     Voting rights ........................................................................................ 6
        3.6     Transferability .................................................................................... 6
        3.7     Re-issue................................................................................................ 6

**4      Conversion** ..................................................................................................... **6**
        4.1     Conversion into Shares ..................................................................... 6
        4.2     Conversion entitlements.................................................................... 6
        4.3     Issue of Shares ................................................................................... 7
        4.4     Effect of conversion .......................................... **Error! Bookmark not defined.**
        4.5     Terms of Shares ................................................................................. 7
        4.6     Compliance with law .......................................................................... 7
        4.7     ASX escrow .......................................................................................... 7

**5      Security** ........................................................................................................... **8**

**6      Indebtedness** ................................................................................................. **8**
        6.1     Acknowledgment of indebtedness ................................................... 8
        6.2     Satisfaction of obligations................................................................. 8

**7      Register** ........................................................................................................... **8**
        7.1     Establishment and maintenance ...................................................... 8
        7.2     Holder details...................................................................................... 8

**8      Company warranties and undertakings** ................................................ **8**
        8.1     Company warranties ........................................................................... 8
        8.2     Company undertakings ...................................................................... 9
        8.3     Reliance ............................................................................................. 10
        8.4     Disclosure .......................................................................................... 10

**9      Investor warranties** .................................................................................... **10**
        9.1     Investor warranties .......................................................................... 10
        9.2     Reliance............................................................................................. 11

DocuSign Envelope ID: 21E764B4-BB8C-4A6C-A35E-87AC05C07555

| 10 | **Default Events** | **11** |
|---|---|---|
| | 10.1 Default Events | 11 |
| | 10.2 Power on default | 12 |
| | | |
| 11 | **Payments** | **12** |
| | 11.1 Method of payment | 12 |
| | 11.2 Right of set off | 12 |
| | | |
| 12 | **Notices** | **12** |
| | 12.1 Notices in writing | 12 |
| | 12.2 Method of service | 12 |
| | 12.3 Addresses for service | 12 |
| | 12.4 Deemed receipt | 13 |
| | 12.5 Facsimile transmission | 13 |
| | | |
| 13 | **Costs** | **13** |
| | 13.1 Stamp duty | **Error! Bookmark not defined.** |
| | 13.2 Costs | **Error! Bookmark not defined.** |
| | | |
| 14 | **General** | **13** |
| | 14.1 Governing law and jurisdiction | 13 |
| | 14.2 Assignment | 14 |
| | 14.3 Variation | 14 |
| | 14.4 Further assurances | 14 |
| | 14.5 Severance | 14 |
| | 14.6 Waiver | 14 |
| | 14.7 No merger | 14 |
| | 14.8 Entire agreement | 14 |
| | 14.9 Time of the essence | 15 |
| | 14.10 Taxes and withholdings | 15 |
| | 14.11 Counterparts | 15 |
| | 14.12 Confidentiality | 15 |
| | 14.13 Public announcements | 16 |

**Schedule 1 – Term Sheet** ................................................................. **17**

**Schedule 2 – Accession Deed** ........................................................ **17**

**Schedule 3 – Note Certificate** ........................................................ **19**

DocuSign Envelope ID: 2F4E76AF4-BB05-4A6C-A35E-B7AC05C0F755

This convertible promissory note deed is dated February 15, 2019.

# Parties

**Overwatch Digital Health, Inc., a Texas corporation (and including, all of its wholly-owned subsidiaries and affiliates, collectively, the "Company"); and**

**Colepin ATF Barrett and Sons Trading Co Super Fund, whose business address is c/o Quantum Partners, Level 1, 95-97 Grafton Street Bondi Junction NSW 2022 Australia ("Investor")**

# Background

A.    The Company has developed an epilepsy management and monitoring system and has signed a binding conditional heads of agreement to undertake a reverse takeover on the ASX (**"RTO"**) to raise a minimum of $4,000,000 (AUD).

B.    The Company wishes to raise up to $1,000,000 (USD) prior to the RTO to Eligible Investors in accordance with the terms and conditions of this deed.

C.    Upon completion of the RTO, the Notes will automatically convert into Shares.

D.    Each Investor, being an Eligible Investor, agrees to subscribe for a Note on the terms and conditions of this deed.

# Agreed terms

## 1    Interpretation

### 1.1    Definitions

In this deed:

(a)    **Accession Deed** means the accession deed set out in Schedule 2;

(b)    **Act** means the United States Securities Act of 1933, as amended.

(c)    **ASX** means ASX Limited ACN 008 624 691 or the Australian Securities Exchange, as the context requires;

(d)    **Authorised Persons** means, in relation to a party:

    (i)    the directors, shareholders, limited partners, general partners and their representatives, and any other person appointed to act as an authorised officer of that party;

    (ii)    the employees of that party;

    (iii)    the legal, financial and other advisers of that party; and

    (iv)    the respective officers and employees of those legal, financial and other advisers;

(e)    **Availability Period** means the period of 3 months from the date of this deed, or such longer period determined by the Company;

1

DocuSign Envelope ID: 12E76454-BB9C-4A6C-A35E-B7AC05C0F755

(f)    **Business Day** means a day other than a Saturday, Sunday or public holiday in Dallas, Texas;

(g)    **Certificate of Formation** means the Certificate of Formation of the Company (as amended from time to time);

(h)    **Change in Control** means the occurrence of any one or more of the following: (i) the accumulation, whether directly, indirectly, beneficially or of record, by any individual, entity or group of 50% or more of the shares of the outstanding Shares, whether by merger, consolidation, sale or other transfer of Shares (other than a merger or consolidation where the shareholders of the Company prior to the merger or consolidation are the holders of a majority of the voting securities of the entity that survives such merger or consolidation), or (ii) a sale of all or substantially all of the assets of the Company, provided, however, that the following acquisitions shall not constitute a Change of Control for the purposes of this deed: (A) any acquisitions of Shares or securities convertible into Shares directly from the Company, or (B) any acquisition of Shares or securities convertible into Shares by any employee benefit plan (or related trust) sponsored by or maintained by the Company.

(i)    **Claim** includes any claim, demand, proceeding, suit, litigation, investigation, audit, action or cause of action in contract, tort, under statute or otherwise;

(j)    **Conversion Date** means the date on which the Company issues Shares under the Prospectus or immediately prior to a Change in Control;

(k)    **Conversion Price** means a price per Share which converts the Face Value of all the Notes into forty percent equity ownership of the Company, on a fully-diluted basis (the "Conversion Ownership Percentage"), and which is currently anticipated to be $1.50 (USD). For purposes of clarity, the Conversion Ownership Percentage will marginally increase as a result of the conversion of interest that has accrued on the Notes.

(l)    **Corporations Act** means the Australian Corporations Act 2001 (Cth);

(m)    **Default Event** means any of the events or circumstances described in Clause 10.1;

(n)    **Eligible Investor** means a sophisticated or professional investor for the purposes of (a) section 708 of the Corporations Act and (b)Rule 501 under the Act, or any other person to whom securities can be issued without disclosure in accordance with applicable securities laws, who is invited by the Company to subscribe for Notes, including the Investor;

(o)    **Face Value** means $1,000 per each Note;

(p)    **Force Majeure Event** means an act of war (whether declared or not), hostilities, invasion, act of foreign enemies, terrorism or civil disorder in each case affecting on a general basis the business of the Company; (b) a strike or strikes or other industrial action or any other form of civil disturbance (whether lawful or not), in each case affecting on a general basis the business of the Company and the settlement of which is beyond the reasonable control of the Company; (c) earthquake or any other natural disaster of overwhelming proportions; or (d) other unforeseeable circumstances beyond the control of the Company against which it would have been unreasonable to take precautions against and which the Company cannot avoid even by using its best efforts, which in each case directly causes the Company to be unable to comply with all or a material part of its obligations under the Notes, including, without limitation, the redemption of the Notes by the Maturity Date;

(q)     **Funding Date** means, in respect of a Note, the date on which the Face Value of the Note is to be paid by the Investor to the Company, as specified in the Term Sheet;

(r)     **Government Agency** means any government or government department, any governmental, semi-governmental or judicial authority or person, any statutory body or authority or body exercising any administrative or legislative function;

(s)     **Interest End Date** means a date determined by the Company which falls within the 1-month period prior to the Lodgement Date, or in the event that the RTO does not complete, the date immediately preceding the Maturity Date;

(t)     **Investor** means an Eligible Investor who agrees to subscribe for, and to whom the Company agrees to issue, a Note in accordance with clause 2.3;

(u)     **Listing Rules** means the official listing rules of the ASX;

(v)     **Lodgement Date** the date that the Company lodges a prospectus with Australian Securities and Investments Commission for the purposes of the RTO;

(w)     **Loss** means any liability, loss, damage, judgment, cost, charge, expense, diminution in value or deficiency of any kind or character which a party pays, suffers or incurs or is liable for, however arising;

(x)     **Majority Investors** mean Investors holding Notes issued under this deed who represent at least 66.67% of the aggregate Face Value of all Notes.

(y)     **Maturity Date** means the date that is 9 months after the date of this deed unless a Force Majeure Event occurs, in which case the Maturity Date shall be extended per each Force Majeure Event but until 18 months from the date of this deed, or such later date agreed by the parties in writing;

(z)     **Monies Payable** means, in respect of a Note, at any particular time, the amount of the Face Value plus interest accrued in accordance with clause 3.1;

(aa)    **Note** means a convertible note issued by the Company under this deed;

(bb)    **Note Certificate** means a certificate in the form set out in Schedule 3;

(cc)    **Prospectus** means the prospectus to be issued by the Company to raise a minimum of $4,000,000 (AUD) under the RTO;

(dd)    **Register** means a register of holders of Notes established and maintained by the Company under Clause 7;

(ee)    **RTO** means the reverse takeover onto the ASX to be undertaken by the Company;

(ff)    **Security** means any document or transaction which reserves or creates a Security Interest;

(gg)    **Security Agreement** means the security agreement attached at Annexure A;

(hh)    **Security Interest** means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest, or any other agreement or arrangement having a similar commercial or legal effect, and includes an agreement to grant or create any of those agreements or arrangements;

(ii)    **Share** means a fully paid common share par value $0.001 (USD) each, in the capital of the Company;

(jj)    **Shareholder** means a holder of one or more Shares; and

(kk)    **Term Sheet** means a term sheet in the form set out in Schedule 1, and which document must not be inconsistent with the terms and conditions of this deed.  To

3

avoid doubt, if the Term Sheet is inconsistent with this deed then this deed prevails
to the extent of the inconsistency.

### 1.2  Interpretation

In this deed, unless the context otherwise requires:

(a)   words importing the singular include the plural and vice versa;

(b)   words importing a gender include any gender;

(c)   other parts of speech and grammatical forms of a word or phrase defined in this
deed have a corresponding meaning;

(d)   an expression importing a natural person includes any company, partnership, joint
venture, association, corporation or other body corporate and any governmental
agency;

(e)   if a party comprises two or more persons, the covenants and agreements on their
part bind and shall be observed and performed by them jointly and each of them
severally and may be enforced against any one or any two or more of them;

(f)   a reference to a part, clause, party, annexure, exhibit or schedule is a reference to
a part and clause of, and a party, annexure, exhibit and schedule to, this deed and
a reference to this deed includes any annexure, exhibit and schedule;

(g)   a reference to a statute, regulation, proclamation, ordinance or by-law includes all
statutes, regulations, proclamations, ordinances or by-laws amending,
consolidating or replacing it, and a reference to a statute includes all regulations,
proclamations, ordinances and by-laws issued under that statute;

(h)   a reference to a document includes all amendments or supplements to, or
replacements or novations of, that document;

(i)   a reference to a party to a document includes that party's successors and permitted
assigns;

(j)   no provision of this deed will be construed adversely to a party solely on the ground
that the party was responsible for the preparation of this deed or that provision;

(k)   a reference to an agreement other than this deed includes an undertaking,
agreement, agreement or legally enforceable arrangement or understanding
whether or not in writing;

(l)   a reference to a body, other than a party to this deed (including, without limitation,
an institute, association or authority), whether statutory or not:

(i)   which ceases to exist; or

(ii)   whose powers or functions are transferred to another body,

is a reference to the body which replaces it or which substantially succeeds to its
powers or functions;

(m)   a right includes a benefit, remedy, discretion or power;

(n)   includes, including, for example or similar expressions means that expression
without limitation;

(o)   Unless otherwise stated, '$' or 'USD' is a reference to the currency of the United
States of America;

(p)   a reference to time is to local time in Dallas, Texas;

DocuSign Envelope ID: 2AE7B4B4-BB0C-4A6C-A35E-B7AC05C0F755

(q)     where the day on or by which any thing is to be done is not a Business Day, that thing must be done on or by the next Business Day; and

(r)     where time is to be calculated by reference to a day or event, that day or the day of the event is included.

## 1.3     Headings

Headings are for convenience only and do not affect the interpretation of this deed.

## 1.4     Executed as a deed

This document is executed as a deed for the purposes of the law.

# 2     Issue of Notes

## 2.1     Issue of Notes

During the Availability Period, the Company may issue Notes to Eligible Investors in accordance with the terms and conditions of this deed.

## 2.2     Maximum amount to be raised

The minimum aggregate of the Face Value of all Notes issued under this deed shall be $500,000 and the maximum shall be $1,000,000.

## 2.3     Agreement to subscribe

(a)     The Investor agrees to subscribe for, and the Company agrees to issue, the Notes specified in the Term Sheet signed by the Company and the Investor on or about the date of this deed.

(b)     During the Availability Period, If an Eligible Investor other than the Investor agrees to subscribe for a Note, and the Company agrees to issue the Note, then:

   (i)     the Eligible Investor and the Company must enter into a Term Sheet which specifies:

      (A)     the Face Value;

      (B)     the Funding Date; and

      (C)     the Maturity Date; and

   (ii)     the Eligible Investor must enter into an Accession Deed under which it agrees to be bound by this deed as if named as a party; and.

   (iii)     The Investor fills out and submits to the Company an accredited investor questionnaire which complies with Israeli law.

## 2.4     Payment and issue

(a)     Subject to clause 2.3, the Investor must pay to the Company an amount equal to the Face Value of the Note on the Funding Date in accordance with the Term Sheet.

(b)     Within 2 Business Days of receiving the Face Value in accordance with clause 2.4(a), the Company must:

   (i)     issue to the Investor the Note specified in the Term Sheet by registering the Investor as the holder of the Note in the Company Register; and

   (ii)     provide to the Investor the Note Certificate in respect of the Note issued.

5

## 3      Notes

### 3.1    Interest

(a)      Each Note will accrue interest at the rate of 8% per annum on the Face Value. Interest shall be calculated on the basis of a 365-day year for the actual number of days elapsed from the applicable Funding Date until the Interest End Date.

(b)      Accrued interest will form part of the Monies Payable in respect of a Note and will be repayable by the Company in cash (if clause applies 3.2) or Shares (if clause 4 applies).

### 3.2    Repayment in cash

If the Company has not completed the RTO by the Maturity Date, the Company must redeem each Note within 15 Business Days of the Maturity Date by paying the Monies Payable to the Investor.

### 3.3    Quotation

A Note will not be quoted or listed on any stock exchange.

### 3.4    Security

The Notes shall be secured on the in accordance with Clause 5 of this deed.

### 3.5    Voting rights

A Note will not provide any voting rights at Shareholder meetings of the Company or other rights as a shareholder of the Company. In the absence of conversion of this Note, no provisions of this Note, and no enumeration herein of the rights or privileges of Holder with respect to this Note, shall itself cause Holder to be a shareholder of the Company for any purpose.

### 3.6    Transferability

A Note is freely transferable subject to the Investor lodging with the Company:

(a)      a proper instrument of transfer, duly stamped if necessary, executed by the transferor and by the transferee, together with the original Note Certificate for the Note to which the transfer relates; and

(b)      an Accession Deed executed by the transferee.

### 3.7    Re-issue

A Note that is converted or redeemed in accordance with this deed will automatically be cancelled and is not available for re-issue.

## 4      Conversion

### 4.1    Conversion into Shares

Each Note (in whole) will automatically convert into Shares on the Conversion Date.

### 4.2    Conversion option

In the event of a Change in Control transaction, each Investor shall have the option immediately prior to the closing of such transaction to either: (a) convert each Note into Shares; or (b) redeem each Note for the Face Value plus accrued and unpaid Interest. The Company shall give each Investor not less than 20-days prior notice of a Change in Control transaction.

DocuSign Envelope ID: 21E76153-BB9C-4A6C-A35E-87AC05C0F555

### 4.3     Optional conversion

In the event the Company consummates, while this Note remains outstanding, an equity financing pursuant to which it sells Shares in a transaction which results in total proceeds to the Company of not less than $1,000,000 (USD) (excluding conversion of the Notes) and which does not constitute an RTO, then the Investors shall have the option at such time to convert their Notes on the same terms set forth in Clause 4.4.

### 4.4     Conversion entitlements

On the Conversion Date, the Investor will be entitled to, and the Company must allot and issue to the Investor, Shares based on the following formula:

$$S = MP / CP$$

Where:

**S** is the number of Shares to be issued to the Investor;

**MP** is the Monies Payable in respect of the Note at the Conversion Date; and

**CP** is the Conversion Price.

### 4.5     Issue of Shares

On the Conversion Date, the Company must allot and issue to the Investor the full number of Shares required to be issued in accordance with Clause 4.2 (rounded up if applicable).  As soon as reasonably practicable thereafter, the Company must provide to the Investor a holding statement in respect of the Shares issued to the Investor.

Upon conversion of a Note in accordance with this Clause 4, the Investor is taken to have agreed to:

(a)     subscribe for the Shares that are to be issued upon conversion of the Note;

(b)     become a Shareholder;

(c)     have its name entered in the Company's register of Shareholders; and

(d)     be bound by the Certificate of Formation.

### 4.6     Terms of Shares

Shares issued upon the conversion of a Note will rank equally in all respects with existing Shares on issue.

### 4.7     Compliance with law

Despite any other provision of this deed, if an issue of Shares under this deed would contravene the Act, Corporations Act or any other applicable laws then, to the extent such issue would contravene such law, the Company's obligation to issue the relevant securities will be deferred until such time or times as the issue of Shares would not contravene the relevant law.

### 4.8     ASX escrow

The parties acknowledge that ASX may require any or all of the Shares issued under this deed to be escrowed for a certain period of time pursuant to the Listing Rules, or otherwise as determined by the ASX. The parties agree to enter into, or procure entry into, any agreements necessary to give effect to any escrow imposed by ASX.

DocuSign Envelope ID: 21E76454-BB9C-4A6C-A35E-B7AC05C0F555

# 5    Security

(a)    The Notes shall be secured by the grant of a Security Interest over all of the present and future assets of the Company, including its intellectual property, in favour of the Investors in accordance with the Security Agreement.

(b)    Contemporaneously with the execution of this deed, the parties must execute the Security Agreement and, as soon as reasonably practicable, do all things necessary to register and perfect the Security Interest created under the Security Agreement.

# 6    Indebtedness

## 6.1    Acknowledgment of indebtedness

The Company acknowledges that, on and from the Funding Date of a Note, and at all times before the repayment of the Note in accordance with Clause 3.2 or the conversion of the Note in accordance with Clause 4, it will be indebted to the Investors in the amount of Monies Payable by all investors.

## 6.2    Satisfaction of obligations

The repayment of a Note in accordance with Clause 3.2 or the conversion of a Note in accordance with Clause 4, operates in full satisfaction of the Company's obligations to the Investor with respect to the Note, and the obligations of the Company with respect to the Note will be extinguished and the Note will be deemed to be cancelled.

# 7    Register

## 7.1    Establishment and maintenance

The Company must establish and maintain a register of the Notes issued by the Company under this deed.

## 7.2    Holder details

The Company must include the following information in the Register in respect of the issued Notes:

(a)    the name and address of each holder;

(b)    the certificate number of Notes held by each holder and their aggregate Face Value; and

(c)    details of all transfers, repayments, redemption and conversion of the Notes.

# 8    Company warranties and undertakings

## 8.1    Company warranties

The Company represents and warrants to the Investor:

(a)    (**status**) it is a corporation with limited liability and is properly incorporated and validly existing under the laws of the place of its incorporation;

(b)    (**shares)** that it has one class of common shares.

(c)    (**capacity**) it has full legal capacity and power to own its assets and to carry on its business as it is presently being conducted and to enter into and perform the transactions contemplated by this deed;

(d)     (**authority**) it has taken all corporate and other action necessary to authorise the execution and performance of this deed so that it is fully valid and binding on and enforceable against it, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(e)     (**authorisations**) all authorisations, approvals, permits, consents, filings and registrations necessary or advisable for or in connection with this deed have been obtained and are in full force and effect; and

(f)     (**no litigation**) no litigation or arbitration, administrative proceedings or other procedure for the resolution of disputes is currently taking place, pending or, to its knowledge threatened against it or its assets, revenues or business or which may have a material adverse effect on it.

## 8.2    Company undertakings

So long as the Notes are not converted or paid, the Company undertakes to the Investor:

(a)     (**maintain status**) to maintain its status as a company limited by shares incorporated under the laws of the place of its incorporation and not to transfer nor permit the transfer of its jurisdiction of incorporation;

(b)     (**comply with applicable laws**) to ensure that the Company complies with all applicable laws related to its business (including without limitation all listing rules and requirements of ASX);

(c)     (**authorisations**) to obtain, maintain and comply with any authorisations which the Company requires to carry out the transactions contemplated in, and to ensure the validity, enforceability and admissibility in evidence of, this deed in all relevant jurisdictions;

(d)     (**notice of litigation**) to give the Investor prompt notice of any litigation, arbitration or administrative proceedings whatsoever which the Company would reasonably deems to be expected to have a material adverse effect to the business of the Company;

(e)     (**inspection of records**) upon notice of not less than five business days, to permit and cause to be permitted during normal business hours, the Majority Investors, persons authorised by the Investor and any employee, agent or consultant of the Majority Investors to examine and take copies of the books of account and all other documents relating to the business or activities of the Company, whether in the possession or under the control of the Company; provided, however, that such information shall be subject to the confidentiality designations provided in this deed and provided further that such examination shall be made not more than 1 time in each calendar  quarter; Such right shall expire upon conversion of the deed to Shares.

(f)     (**notice of incorrect warranty**) to notify the Investor promptly if any representation or warranty made in this deed or undertaking taken to be made by or on behalf of the Company in connection with this deed or a Note is found to be materially incorrect or materially misleading when made or taken to be made and would reasonably deems to be expected to have a material adverse effect to the business of the Company;

(g)     (**default certificate**) on the written request of the Investor, to promptly provide the Investor with a certificate signed by an officer of the Company which states in writing whether a Default Event or event which with the giving of notice, lapse of time or fulfilment of any condition would become a Default Event continues unremedied and is not waived; and

(h)   **(board member)** to reserve one seat on the Company's board of directors for a director to be nominated by the Majority Investors.

(i)   (intellectual property) the Company owns or possesses sufficient legal rights to all of the intellectual property necessary or required to conduct its business as now conducted and as presently proposed to be conducted.  Each current and former employee and consultant of the Company has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted.

(j)   (employee and consultant agreements) each current and former employee and consultant of the Company has executed an agreement with the Company containing confidentiality, non-disclosure of the Company's proprietary information, inventions assignment, non-solicitation and non-compete provisions.  No current or former employee, consultant or officer has excluded works or inventions from his or her inventions assignment obligations to the Company.

### 8.3   Reliance

The Company acknowledges that the Investor has entered into this deed in reliance on the representations and warranties given by the Company in this deed.

### 8.4   Disclosure

The Investor acknowledges that the Company is not liable in respect of any Loss or Claim to the extent that the matter giving rise to the Loss or Claim was disclosed:

(a)   by the Company to the Investor in writing prior to the date of this deed; or

(b)   in public records dated prior to the date of this deed including searches of public registers.

## 9   Investor warranties

### 9.1   Investor warranties

The Investor represents and warrants to the Company:

(a)   (**status**) if the Investor is a Company, it is a corporation with limited liability and is properly incorporated and validly existing under the laws of its country of registration;

(b)   (**capacity**) it has full legal capacity and power to own its assets and to carry on its business as it is presently being conducted and to enter into and perform the transactions contemplated by this deed;

(c)   (**authority**) if the Investor is a Company, it has taken all corporate and other action necessary to authorise the execution and performance of this deed so that it is fully valid and binding on and enforceable against it, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(d)   (**authorisations**) all authorisations, approvals, permits, consents, filings and registrations necessary or advisable for or in connection with this deed have been obtained and are in full force and effect; and

(e)   (**exempt investor**) on the date of this deed, and on each date securities are issued under this deed, the Investor is eligible to receive an offer of, and issue of, securities under this deed in accordance with all applicable securities laws, and there is no requirement for a prospectus or any other form of disclosure document to be lodged

or registered with any Government Agency for the purposes of the Company offering or issuing securities to the Investor under this deed.

(f)    The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.  The Investor's principal place of business is correctly set forth beneath the Investor's name on the signature pages hereto.

## 9.2    Reliance

The Investor acknowledges that the Company has entered into this deed in reliance on the representations and warranties given by the Investor in this deed.

# 10    Default Events

## 10.1    Default Events

Each of the following is a Default Event:

(a)    (**other obligations**) the Company fails to comply with any provision of this deed which failure, if capable of remedy, is not remedied within 10 Business Days from the Company's receipt of notice from the Majority Investors ;

(b)    (**misrepresentation**) any representation, warranty or statement made or repeated in or in connection with this deed is untrue or misleading (whether by omission or otherwise) when so made or repeated or becomes untrue or misleading when taken as a whole and which has a material adverse effect on the Company's business;

(c)    (**involuntary winding up**) an application or order is made for the winding up of the Company or for the appointment of a liquidator and such appointment was not dismissed within 45 Business Days;

(d)    (**voluntary winding up**) the Company passes a resolution for its winding up;

(e)    (**receiver**) a receiver, controller  or analogous person is appointed to take possession of all, or any part of, the assets of the Company or a Subsidiary of the Company and such appointment was not dismissed within 30 Business Days;

(f)    (**insolvency**) the Company:

(i)    an involuntary Insolvency proceeding is begun against the Company and not dismissed or stayed within forty-five (45) Business Days; or

(ii)    the Company (i) is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due, or insolvent; (ii) admits its inability to pay its debts as they fall due;

(g)    (**compromise or arrangement**) the Company takes any step for the purpose of entering into a compromise or arrangement with any of its members or creditors except for the purpose of a reconstruction, amalgamation, merger or consolidation on terms approved by the Majority Investors;

(h)    (**failure to comply with waiver**) if any Default Event (or occurrence which would otherwise have been or become a Default Event) is conditionally waived by the Majority Investors and the Company does not comply with those conditions or those conditions are not fulfilled (whether by the Company or any other person) or are or become incapable of fulfilment and such non-compliance is not remedied within 10 Business Days from the Majority Investors written notice to the Company.

## 10.2    Power on default

If a Default Event occurs, the Majority Investors may, at any time during which the Default Event remains unremedied, by written notice to the Company, declare all Monies Payable to be immediately due and payable to the Investors, and the Company must immediately pay such Monies Payable to the Investors.

# 11    Payments

## 11.1    Method of payment

All payments in connection with this deed must be made:

(a)    by unendorsed bank cheque payable to the party to whom the payment is due, or to any other person nominated in writing by the party to whom the payment is due, no later than 3.00pm on the due date for payment;

(b)    by way of direct transfer of immediately available funds to an account nominated in writing by the party to whom the payment is due no later than 3.00pm on the due date for payment; or

(c)    in such other form of immediately available funds or cleared funds as may be agreed in writing between the parties.

## 11.2    Right of set off

If any amount is payable by the Investor to the Company under this deed, the Company is entitled to set off that amount against any amount payable by the Company to the Investor under this deed.

# 12    Notices

## 12.1    Notices in writing

A notice or other communication connected with or provided under this deed does not have any legal effect unless it is in writing and in the English language.

## 12.2    Method of service

In addition to any other method of service provided by law, the notice may be:

(a)    delivered by hand at the address of the addressee party set out in this deed or subsequently notified;

(b)    sent by prepaid post to the address of the addressee party set out in this deed or subsequently notified;

(c)    sent by facsimile to the facsimile number of the addressee party at the commencement of this deed or such other number as may be notified; or

(d)    by electronic communication including email.

## 12.3    Addresses for service

(a)    The authorised address of each party for service of notices is the address set opposite its name below, or such other address as the party may from time to time advise by notice to the other parties:

Overwatch Digital Health, Inc.17440 N Dallas Parkway, Suite 230
Dallas, Texas 75287
United States of America

DocuSign Envelope ID: 21E764B4-BB9C-4A6C-A35E-B7AC05C07355

| Attention: | Terry Fokas |
| | Chief Executive Officer |
| Facsimile: | N/A |
| Email: | terryfokas_esq@yahoo.com |

    (i)    As listed in Schedule 2

(b)    Despite clause 12.3(a), a party may also serve a notice to another party at any of the following addresses:

    (i)    for a party that is an individual, that party's principal place of residence; or

    (ii)    for a party that is a corporation:

        (A)    that party's registered office; or

        (B)    that party's principal place of business.

## 12.4 Deemed receipt

If a notice is sent or delivered in a manner provided by clause 12.2, it must be treated as given to and received by the addressee party if delivered or transmitted before 5.00pm on a Business Day in the place of receipt:

(a)    if delivered by hand, on the date of delivery;

(b)    if sent by post, on the second Business Day (at the address to which it is posted) after posting unless returned to the sender party;

(c)    if delivered by facsimile, upon the date of transmission provided that a transmission confirmation is generated by the sender party; or

(d)    if delivered by electronic communication, upon the date of transmission provided that a delivery receipt is obtained by the addressee party.

## 12.5 Facsimile transmission

A facsimile transmission is legible unless the addressee party telephones the sender party:

(a)    if during the hours of 9.00am and 5.00pm on a Business Day in the place of the addressee party, within 2 hours after transmission is received; or

(b)    if outside the hours specified in clause 12.5(a), by 11.00am on the next Business Day,

informing the sender party that it is not legible.

# 13   Costs

The Company will bear all costs (including legal costs), of and incidental to the preparation, negotiation and execution of this deed. I

## 13.1 Governing law and jurisdiction

(a)    This deed is governed by and construed in accordance with the laws of the United States and the State of Texas without regard to conflicts of laws provision.

**13.2** The parties consent to the exclusive jurisdiction and venue of the state and federal courts in Collin County, Texas and agree to waive all objections to personal jurisdiction, venue and *forum non conveniens.*

(a)

## 13.3 Assignment

Subject to Clause 3.6, a party must not assign or deal with any right under this deed without the prior written consent of the other parties. Any purported dealing in breach of this Clause 13.3 is of no effect.

## 13.4 Variation

An amendment or variation to this deed is not effective unless it is in writing and signed by the Company and the Majority Investors

## 13.5 Further assurances

Each party must sign, execute and do all deeds, acts, documents and things as may reasonably be required by the other party to effectively carry out and give effect to the terms and intentions of this deed.

## 13.6 Severance

If any provision or part of a provision of this deed is held or found by a court of competent jurisdiction to be void, invalid or otherwise unenforceable (whether in respect of a particular party or generally), it will be deemed to be severed to the extent that it is void or to the extent of voidability, invalidity or unenforceability, but the remainder of that provision will remain in full force and effect.

## 13.7 Waiver

(a) A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b) The exercise of a power or right does not preclude either its exercise in the future or the exercise of any other power or right.

(c) The Majority Investors may exercise the right of waiver in relation to this deed for and on behalf of all Investors.

(d) A waiver by a party is not effective unless it is in writing and signed by the Company and the Majority Investors.

## 13.8 No merger

Any right or obligation of any party that is expressed to operate or have effect on or after the completion, expiration or termination of this deed for any reason, does not merge on the occurrence of that event but remains in full force and effect.

## 13.9 Termination; Release of Collateral.

Upon the repayment in full of all Notes or the conversion of the Notes in accordance with the terms set forth therein, this deed shall automatically terminate, and all Security Interests shall terminate and all rights shall revert to the Company. Upon any such termination, the Investors (following receipt of written notice of such termination from the Company) will execute and deliver to the Company at Company's expense, such documents as the Company shall reasonably request to evidence the termination of the Security Interests.

### 13.10  Entire agreement

This deed contains the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings between the parties in connection with it.

### 13.11  Time of the essence

Time is of the essence in this deed and no extension or variation of time granted by any party operates as a waiver of this clause 13.11.

### 13.12  Taxes and withholdings

The Investor understands that Investor shall be exclusively responsible for Investor's own tax liability that may arise as a result of the transactions contemplated by this deed and/or the Notes. Notwithstanding anything herein to the contrary, the Company shall be entitled to deduct and withhold from any payment payable to the Investor hereunder, such amounts as the Company is required to deduct and withhold with respect to the making of any such payment under any applicable law at the applicable rate for such withholding, unless the Company is provided with a valid tax certificate stating that no withholding, or reduced withholding, of tax is required with respect to such payment or providing any other instructions regarding tax withholding, in a form and substance reasonably acceptable to the Company, no later than five Business Days prior to the applicable date of payment thereof, in which case the taxes shall not be withheld, or shall be withheld at the applicable reduced rate and the balance of the applicable payment, as applicable, not so withheld shall be paid to the Investor.

### 13.13  Counterparts

This deed may be executed in any number of counterparts (including by way of facsimile) each of which shall be deemed for all purposes to be an original and all such counterparts taken together shall be deemed to constitute one and the same instrument.

### 13.14  Confidentiality

Each party agrees not to disclose any information relating to another party or its business (which has been provided by any other party or which is otherwise received by a party), this deed or the terms of this deed except:

(a)    to any person in connection with an exercise of its rights or obligations imposed under this deed;

(b)    to the Authorised Persons of that party on a confidential basis;

(c)    with the consent of the party who provided the information (which consent must not be unreasonably withheld);

(d)    where the information is in the public domain as at the date of this document (provided that the party can provide written evidence to confirm this was the case) or subsequently becomes in the public domain other than by breach of any obligation of confidentiality binding on any party; or

(e)    as required by any law or required or requested by an authority such as a Government Agency, court, tribunal or recognised stock exchange, but if a party is so required or requested to make any disclosure, the relevant party must promptly notify the other party, where practicable and lawful to do so, before the disclosure occurs and must co-operate with the other party regarding the timing and content of such disclosure or any action which the other party may reasonably elect to take to challenge the validity of such requirement.

**13.15**   **Public announcements**

Except to the extent prevented by law and subject to clause 13.14, all investors releases or presentations relating in any way to this deed must be on terms agreed by the Company and the Majority Investors.

DocuSign Envelope ID: 12E76AF4-BB9C-4A6C-A35E-B7AC05C07855

# Schedule 1 – Term Sheet

February 15, 2019

Overwatch Digital Health, Inc. (the **"Company"**), a Texas corporation with its principal place of business at 17440 Dallas Parkway, Suite 230, Dallas, Texas 75287

The Investor agrees to subscribe for, and the Company agrees to issue, the following Notes on the terms and conditions of the Convertible Note Deed dated February 15, 2019 (the **"Deed"**) and this Term Sheet. The parties agree that this document constitutes a Term Sheet for the purposes of the Deed and serves as the Investor's application for the Note.

| | |
|---|---|
| **Number of Notes** | 500 (face value of $1,000 USD/Note) |
| **Aggregate Face Value** | $500,000 USD |
| **Funding Date** | February 15, 2019 |
| **Maturity Date** | November 15, 2019 |

Payment is to be made to the following bank account and otherwise in accordance with the Deed:

Account name: Overwatch Digital Health, Inc.
Bank: Plains Capital Bank P.O. Box 271, Lubbock, Texas 79408
BSB: ██████████
Account No.: ██████████
SWIFT code: PLASUS44

**Executed by: Colepin ATF Barrett and Sons Trading Co Super Fund**

Authorised Representative

Clive Barrett
Name of Authorised Representative

**Executed by: OVERWATCH DIGITAL HEALTH, INC.**

Terry Fokas
Chief Executive Officer

17

DocuSign Envelope ID: 2JE76464-BB0C-A6C-A35E-B7AC05C0735521

# Schedule 2 – Accession Deed

February 15, 2019

To: **Overwatch Digital Health, Inc.** (the **"Company"**)

From: **Colepin ATF Barrett and Sons Trading Co Super Fund**, a company registered in Australia, of c/o Quantum Partners Level 1, 95-97 Grafton Street Bondi Junction, NSW 2022 Australia

Dear Sirs

1.      We refer to the Convertible Note Deed dated February 15, 2019 (the **"Deed"**), of which we confirm we have received a copy.  This deed will take effect as an Accession Deed for the purposes of the Deed.  Unless the context requires, capitalised terms defined in this deed have the meaning given in the Deed.

2.      Colepin ATF Barrett and Sons Trading Co Super Fund agrees to become an Investor and to be bound by the terms and conditions of the Deed, and the relevant Term Sheet, as an Investor with effect from the date of this deed.

3.      Colepin ATF Barrett and Sons Trading Co Super Fund's notice details for the purposes of the Deed and the Register are as follows:

   Address:      c/o Quantum Partners Level 1, 95-97 Grafton Street Bondi Junction, NSW 2022 Australia

   Attention:    Mr. Clive Barrett

   Facsimile:

   Email:        clive.barrett@fcfg.com.au

4.      This deed is governed by and construed in accordance with the laws of the United States and the State of Texas without regard to conflicts of laws provisions.  The parties submit to the exclusive jurisdiction of the state and federal courts in Collin County, Texas and agree to waive all objections to personal jurisdiction, venue and *forum non conveniens* and any courts which may hear appeals from those courts in respect of any proceedings in connection with this deed.

**Executed as a deed.**

**Executed by: Colepin ATF Barrett and Sons Trading Co Super Fund**

DocuSigned by:

_____
Authorised Representative

Clive Barrett
_____
Name of Authorised Representative

18

# Schedule 3 – Note Certificate

## OVERWATCH DIGITAL HEALTH, INC.

## Note Certificates

## Certificate Numbers: 1 – 500

Head Office/Note Registry: 17440 Dallas Parkway, Suite 230, Dallas, Texas 75287 USA

This is to certify that Colepin ATF Barrett and Sons Trading Co Super Fund, a company registered in Australia, of c/o Quantum Partners Level 1, 95-97 Grafton Street Bondi Junction, NSW 2022 Australia (**Investor**) is the registered holder of the Notes specified below which was issued on February 15, 2019.

The Notes confer on the Investor the rights, power and privileges set out in, and is subject to the terms and conditions of, the Convertible Note Deed dated February 15, 2019 between the Company and the Investor.

| | |
|---|---|
| **Number of Notes** | 500 (face value of $1,000/Note) |
| **Aggregate Face Value** | $500,000.00 USD |
| **Funding Date** | February 15, 2019 |
| **Maturity Date** | November 15, 2019 |

**Executed by OVERWATCH DIGITAL HEALTH, INC., a Texas corporation:**

DocuSigned by:

*Terry Fokas*

───────79C90DD5B2514FA...

Terry Fokas
Chief Executive Officer

# Executed as a deed.

**Executed by OVERWATCH DIGITAL HEALTH, INC., a Texas corporation:**

Terry Fokas
Chief Executive Officer

**Executed by Colepin ATF Barrett and Sons Trading Co Super Fund in accordance with its constituent documents:**

Director/Company Secretary

Clive Barrett
Name of Director/Company Secretary

Annexure A – Security Agreement

[Provided Under Separate Cover]

# **EXHIBIT C**

Overwatch Unsecured Notes to Mossco Capital, Inc.

## PROMISSORY NOTE AND WARRANT PURCHASE AGREEMENT

This Promissory Note and Warrant Purchase Agreement (this "Agreement") is made and entered into as of September 04, 2019 ("Effective Date") by and between Overwatch Digital Health, Inc., a Texas corporation ("Company"), and Mossco Capital, Inc. ("Purchaser").

WHEREAS, the Company desires to sell to the Purchaser, and the Purchaser desires to purchase from the Company, a promissory note in the principal amount of $300,000.00 (USD) ("Investment") in the form attached hereto as Exhibit A ("Note") and with such maturity dates set forth in the Note.

WHEREAS, as an inducement for the Purchaser to enter into this Agreement, the Company shall grant to the Purchaser on the date of this Agreement a warrant to purchase shares of the Company's common stock ("Warrant Shares"); all Warrant Shares have an exercise price of $1.56 ("Exercise Price") and are exercisable for a term of five years by cash exercise only. The form of warrant is attached hereto as Exhibit B ("Warrant").

NOW, THEREFORE, in consideration of the foregoing recitals and the representations, and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      PURCHASE AND SALE OF NOTES; GRANT OF WARRANTS.

        (a) Purchase and Sale of Note. Simultaneously with the execution and delivery of this Agreement, the Purchaser shall deliver the Investment to the Company against delivery of the Note to the Purchaser by the Company.

        (b) Grant of Warrants. On the date of this Agreement, the Company shall grant to the Purchaser, and the Purchaser shall accept from the Company, the Warrant.

2.      CLOSING DATE. The closing of the purchase and sale of the Note shall take place on the Effective Date.

3.      REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company hereby represents and warrants to the Purchaser, as of the date hereof:

        (a) Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas and has all corporate power and authority required to (i) carry on its business as currently conducted and as proposed to be conducted by the Company and (ii) enter into this Agreement, the Note and the Warrant and consummate the transactions contemplated hereby and thereby. The Company is qualified to do business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on the Company. As used in this Agreement, "Material Adverse Effect" means a material adverse change in, or a series of events which, in the aggregate, has a material adverse effect on or change in, the business, financial condition, operations, assets or liabilities of the Company.

        (b) Due Authorization. All corporate action on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all obligations of the Company under, this Agreement, the Note and the Warrant has been taken, and this Agreement, the Note and the Warrant constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their terms, except (i) as may be limited by (A) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally and (B) the effects of rules of law governing the availability of equitable remedies and (ii) as rights to indemnity or contribution may be limited under federal or state securities laws or by principles of public policy thereunder.

        (c) Valid Issuance of Stock.

1

(i) Valid Issuance. The Warrant Shares have been duly and validly reserved for issuance and, upon issuance, sale and delivery in accordance with the terms of the Warrant, will be duly and validly issued, fully paid, non-assessable and free of preemptive rights binding on the Company.

(ii) Compliance with Securities Laws. The Note and Warrant will be issued to the Purchaser in compliance with applicable exemptions from the registration, prospectus delivery requirements and qualification requirements of all applicable securities laws of the states of the United States.

(d) Non-Contravention. The execution, delivery and performance by the Company of this Agreement, the Note and the Warrant, and the consummation by the Company of the transactions contemplated hereby and thereby, do not: (i) contravene or conflict with the Company's Certificate of Incorporation or the Company's By-Laws; (ii) constitute a violation of any provision of any federal, state, local or foreign law or rule, regulation or requirement binding upon or applicable to the Company; or (iii) constitute a default or require any consent under, give rise to any right of termination, cancellation or acceleration of, or to a loss of any benefit to which the Company is entitled under, or result in the creation or imposition of any lien, claim or encumbrance on any assets of the Company, except any such default, consent, right of termination, cancellation or acceleration, loss or lien, claim or encumbrance which, individually or in the aggregate, would not have a Material Adverse Effect on the Company.

(e) Litigation.  There is no action, suit, proceeding, claim, arbitration or investigation pending or, to the Company's best knowledge, threatened: (i) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries in connection with such officer's, director's or employee's relationship with, or actions taken on behalf of, the Company or such subsidiary; or (ii) against the Company or any of its subsidiaries, or any officer, director or employee of the Company or any of its subsidiaries that seeks to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement.

4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER. The Purchaser hereby represents and warrants to the Company, as of the date hereof, that:

(a) Investment Experience. The Purchaser understands that the acquisition of the Note and Warrant Shares involves substantial risk. The Purchaser has experience as an Purchaser in securities of companies and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment and protecting its own interests in connection with this investment.

(b) Accredited Purchaser Status. The Purchaser is an "accredited Purchaser" within the meaning of Regulation D promulgated under the Securities Act.

5.    ADJUSTMENT AND RECLASSIFICATION PROVISIONS.

(a) Reorganization, Reclassification or Recapitalization of the Company. In case of (i) a capital reorganization, reclassification or recapitalization of the Warrant Shares (other than in the cases referred to in Section 3(c) hereof), (ii) the Company's consolidation or merger with or into another corporation in which the Company is not the surviving entity, or a merger in which the Company is the surviving entity but the Warrant Shares outstanding immediately prior to the merger are converted, by virtue of the merger, into other property, whether in the form of securities, cash or otherwise, or (iii) the sale or transfer of all or substantially all of the Company's assets, then, as part of such reorganization, reclassification, recapitalization, merger, consolidation, sale or transfer, lawful provision shall be made so that there shall thereafter be deliverable upon the exercise of the Warrant or any portion thereof (in lieu of or in addition to the number of Warrant Shares theretofore deliverable, as appropriate) and without payment of any additional consideration, the number of shares of stock or other securities of property to which the holder of the number of Warrant Shares which would otherwise have been deliverable upon the exercise of the Warrant or any portion thereof at the time of such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer would have been entitled to receive in such reorganization, reclassification, recapitalization, consolidation, merger, sale or transfer. This Section 5(a) shall apply to successive reorganizations, reclassifications, recapitalizations, consolidations, mergers, sales and transfers and to the stock or securities of any other corporation that are at the time

2

receivable upon the exercise of the Warrant or any portion thereof. If the per share consideration payable to the Purchaser for Warrant Shares in connection with any transaction described in this Section 5(a) is in a form other than cash or marketable securities, then the value of such consideration shall be determined in good faith by the Company's Board of Directors.

(b) Splits and Combinations. If the Company at any time or from time to time after the date of the Agreement subdivides any of its outstanding Warrant Shares into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and, conversely, if the outstanding Warrant Shares are combined into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased.

(c) Reclassifications. If the Company reclassifies or otherwise changes any of the Warrant Shares into the same or a different number of securities of any other class or classes, the Warrant Shares shall thereafter be convertible into such number and kind of securities as would have been issuable as the result of such change with respect to the Warrant Shares immediately prior to such reclassification or other change and the Exercise Price therefore shall be appropriately adjusted.

(d) Liquidation; Dissolution. If the Company shall dissolve, liquidate or wind up its affairs, the Purchaser shall have the right, but not the obligation, to convert the Note and exercise the Warrant effective as of the date of such dissolution, liquidation or winding up.

(c) Adjustment Certificates. Upon any adjustment of the purchase price or the number of Warrant Shares issuable upon exercise or conversion, a certificate, signed by (i) the Company's Chief Financial Officer or (ii) any independent firm of certified public accountants of recognized national standing the Company selects at its own expense, setting forth in reasonable detail the events requiring the adjustment and the method by which such adjustment was calculated, shall be mailed to the Purchaser at the address set forth in Section 6 hereof and shall specify such adjustments.

(f) No Impairment. The Company shall not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms hereunder by the Company, but shall at all times in good faith assist in the carrying out of all provisions of this Agreement and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Purchaser against impairment.

6.     MISCELLANEOUS.

(a) Governing Law. This Agreement shall be governed by and construed under the internal laws of the State of Texas, without reference to principles of conflict of laws or choice of laws.

(b) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(c) Amendments and Waivers. This Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchaser.

(d) Severability. If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e) Entire Agreement. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OVERWATCH DIGITAL HEALTH, INC.

Terry Fokas
Chief Executive Officer

MOSSCO CAPITAL, INC.

Name: _Moss Wadey_____

Address: _____

_____

4

**EXHIBIT A**

**PROMISSORY NOTE**

**OVERWATCH DIGITAL HEALTH, INC.**

10% Promissory Note

Maturity Date: December 01, 2019 or April 01, 2020

This Promissory Note is being delivered pursuant to that certain Promissory Note and Warrant Purchase Agreement, dated as of September 04, 2019, between the Purchaser and the Company (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

FOR VALUE RECEIVED, the Company promises to pay to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before December 041, 2019 ("First Maturity Date") or on or before April 04, 2020 ("Second Maturity Date"), as the case may be. In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the First Maturity Date, interest on the outstanding Investment shall accrue at a rate of 10.0% per annum ("First Interest Rate"). In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before the Second Maturity Date interest on the outstanding Investment shall accrue at a rate of 20.0% per annum ("Second Interest Rate"). Payment of the Investment together with accrued but unpaid interest thereon shall be paid on or before either the First Maturity Date or the Second Maturity Date in the sole discretion of the Company.

If all or a portion of the Investment and/or the First Interest Rate or the Second Interest Rate, as the case may be, is not paid when due (either at the First Maturity Date or the Second Maturity Date), the Company hereby promises to pay, on demand, interest on such overdue amount from and including the due date to, but excluding, the date such amount is paid in full at 25% per annum (and until the date such overdue amount is paid in full, interest on such overdue amount shall mean interest at such rate).

1.      Payment.

(a) Payment of the Investment and the First Interest Rate or the Second Interest Rate, as the case may be, when due (either at the First Maturity Date or the Second Maturity Date) shall be made by certified or bank cashier's check payable to the Purchaser, or by bank wire transfer, in immediately available funds, to the account so specified, in lawful money of the United States of America. If the maturity date occurs on a date that is not a Business Day then the Investment or interest then due shall be paid on the next succeeding Business Day. "Business Day" shall mean any day other than Saturday, Sunday or any day upon which banks are authorized or required to be closed.

(b) Prepayment. The Company may prepay and the holder may request prepayment of this Note at any time without premium or penalty, in whole or in part, with accrued interest to the date of such payment on the amount prepaid.

(c) Application of Payments. Payments made in connection with this Note shall be applied first to amounts due hereunder and thereafter to the First Interest Rate or Second Interest Rate interest and finally to the Investment.

2.      Default and Remedies.

(a) If any of the following events or conditions (each an "Event of Default") shall occur and be continuing:

(i) The Company shall fail to pay the Investment and any interest due 30 days subsequent to the the First Maturity Date or the Second Maturity Date, as the case may be;

(ii) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of the Company, or of a substantial part of the property or assets of the Company, under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) the appointment of a receiver, trustee, custodian, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company or (C) the winding-up, liquidation or dissolution of the Company; and such proceeding or petition shall continue undismissed for 90 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(iii) the Company (A) voluntarily commences any proceeding or files any petition seeking relief under the bankruptcy laws of the United States Code, or any other Federal or state bankruptcy, insolvency, receivership or similar law, (B) consents to, or fails to contest in a timely and appropriate manner, the commencement against of any proceeding or the filing of any petition described in clause (ii) above, (C) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the properties or assets of the Company, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment for the benefit of creditors, (F) becomes unable, admits in writing its inability or fails generally to pay its debts as they become due or (G) takes any action for the purpose of effecting any of the foregoing; then, (x) in the case of an Event of Default specified in clause (a)(i) or (ii) above, the Purchaser may, at any time during the continuance of such Event of Default, by written notice to the Company, declare the entire outstanding Investment, together with all accrued and unpaid interest, to be due and payable and (y) in the case of an Event of Default specified in clauses (a)(i), (ii), or (iii) above, the entire outstanding Investment, together with all accrued and unpaid interest, shall automatically forthwith become due and payable without presentment, protest or notice of any kind, all of which are hereby expressly waived by the Company.

(b) Subject to the other terms of this Note, if an Event of Default occurs and is continuing, the Purchaser may pursue any available remedy to collect the payment of the Investment or interest or to enforce the performance of any provision of this Note. If an Event of Default occurs and is continuing, the Purchaser may proceed to protect and enforce its rights by any action at law, suit in equity or other appropriate proceeding. In the case of a default in the payment of the Investment or Interest, the Company will pay to the Purchaser such further amount as shall be sufficient to cover the costs and expenses of collection, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

(c) Default Interest. If an Event of Default occurs, the Interest will increase to 25% per annum subsequent to the date of Event of Default.

3.        Notices

All notices and other communications in connection herewith shall be in writing and be sent to:

If to the Company to:   Overwatch Digital Health, Inc.
                        17440 Dallas Parkway, Suite 230
                        Dallas, TX 75287
                        Attention: Chief Executive Officer


If to the Purchaser to:  As written on signatory page of the Agreement

4.        Miscellaneous.

6

This Note shall be construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of laws rules. The Company waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default and enforcement of this Note. The Company hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the courts of the State of Texas and of the United States District Court for the Eastern District of Texas, and any appellate court of such courts, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and the Company hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas court (or, to the extent permitted by law, in such federal court). The Company agrees that a final, unappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Purchaser may otherwise have to bring any action or proceeding relating to this Note against the Company or its properties in the courts of any jurisdiction.

If any provision of this Note shall be held invalid or unenforceable by any court of competent jurisdiction, that holding shall not invalidate or render unenforceable any other provision hereof.

This Note may not be changed, amended or modified except by agreement in writing signed by the Company and the Purchaser.

IN WITNESS WHEREOF, the Company has caused this Note to be signed on its behalf, in its corporate name, by its duly authorized officer as an instrument under seal, as of September 04, 2019.

OVERWATCH DIGITAL HEALTH, INC.

Terry Eokas
Chief Executive Officer

**EXHIBIT B**

**OVERWATCH DIGITAL HEALTH, INC.**

**COMMON STOCK WARRANT**

Issued: September 04, 2019

Warrant to Purchase Shares of Common Stock

Expiration Date: September 04, 2024

Overwatch Digital Health, Inc. ("Company"), hereby certifies that, for value received, Mossco Capital, Inc. ("Purchaser") is entitled, on the terms set forth below, to purchase any time until 5:00 p.m., Central Time, on the Expiration Date the following fully paid and nonassessable shares of the Common Stock of the Company, at a price per share of $1.56 (the "Purchase Price" – as subject to adjustment pursuant to Section 5 of the Promissory Note and Warrant Purchase Agreement by and among the Company and Purchaser): (a) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before December 04, 2019 ("First Maturity Date") Purchaser may purchase at the Purchase Price up to $30,000 in Warrant Shares; (b) In the event that the Company pays to Purchaser, the Investment, together with accrued but unpaid interest thereon, on or before April 04, 2020 ("Second Maturity Date") Purchaser may purchase at the Purchase Price up to $45,000 in Warrant Shares; or (c) If all of the Investment and the interest, is not paid when due (either at the First Maturity Date or the Second Maturity Date), Purchaser may purchase at the Purchase Price up to $75,000 in Warrant Shares.

This Warrant is being issued pursuant to the Promissory Note and Warrant Agreement dated September 04, 2019 between the Company and Purchaser (the "Agreement"). All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

1.        Exercise of Warrant; Transfer of Warrant.

(a) Exercise of Warrant. At any time prior to 5:00 p.m. on the Expiration Date, the Warrant may be exercised by the Purchaser, by surrendering this Warrant to the Company, together with an executed Notice of Exercise, substantially in the form attached hereto as Exhibit 1, at the Company's primary executive office, with payment by check to the Company of the amount obtained by multiplying the number of shares of Common Stock with respect to which this Warrant is being exercised by the Purchase Price.  No partial exercise of the Warrant is allowed.

(b) Fractional Shares. No fractional shares of Common Stock shall be issued upon any exercise or conversion of this Warrant. Instead of any fractional share which would otherwise be issuable upon exercise or conversion, the Company shall pay a cash amount in respect of each fractional share at a price equal to an amount calculated by multiplying such fractional share (calculated to the nearest 1/100th of a share) by the Fair Market Value of a share of Common Stock on the date of exercise or conversion, as applicable, minus the Purchase Price. Payment of such amount shall be made in cash or by check payable to the order of the Purchaser at the time of delivery of any certificate or certificates arising upon such exercise or conversion.

(c) Taxes. The Company will not be required to pay any tax imposed in connection with any transfer involved in the issuance of a Warrant or a certificate for shares of Common Stock in any name other than that of the Purchaser hereof, and in such case, the Company will not be required to issue or deliver any stock certificate or Warrant until such tax is paid.

(d) Transfer of Warrant. Transfer of this Warrant to a third party shall be effected by execution and delivery of the Notice of Assignment attached hereto as Exhibit 2 and surrender of this Warrant for registration of transfer of this Warrant at the primary executive office of the Company, together with funds sufficient to pay any applicable transfer tax. Upon receipt of the duly executed Notice of Assignment and the necessary transfer tax funds,

if any, the Company, at its expense, shall execute and deliver, in the name of the designated transferee or transferees, one or more new Warrants representing the right to purchase a like aggregate number of shares of Common Stock.

2.        Notices of Record Date. In case (a) the Company takes a record of holder of Common Stock for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities; (b) of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation, or any conveyance of all or substantially all of the assets of the Company to another corporation; or (c) of any voluntary dissolution, liquidation or winding-up of the Company; then, in each such case, the Company will mail to each holder of a Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the date on which such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and time, if any is to be fixed, as of which the Purchasers of record of Common Stock (or such other stock or securities at the time receivable upon the exercise or conversion of the Warrant) will be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up. Such notice shall be mailed at least ten days prior to the date specified therein.

4.        Replacement of Warrant. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) or (in the case of mutilation) upon surrender and cancellation thereof, the Company at its expense, will issue a replacement.

5.        Transferability of Warrant; No Redemption. This Warrant and all rights hereunder are freely transferable by the Purchaser, subject to compliance with applicable state and federal securities laws. This Warrant shall not be redeemable by the Company, in whole or in part, at any time.

6.        Notices. All notices and other communications given hereunder shall be sent to:

If to the Company to:   Overwatch Digital Health, Inc.
                        17440 Dallas Parkway, Suite 230
                        Dallas, TX 75287
                        Attention: Chief Executive Officer

If to the Purchaser to:   As written on signatory page of the Agreement

7.        Change; Amendment or Waiver. This Warrant may not be changed, amended or modified except by written agreement of the Company and the Purchaser.

8.        Governing Law. This Warrant shall be construed in accordance with and governed by the laws of Texas without regard to its conflicts of laws rules.

Dated: September 04, 2019

                              OVERWATCH DIGITAL HEALTH, INC.


                              Terry Fokas
                              Chief Executive Officer

9

**EXHIBIT 1**

**NOTICE OF EXERCISE OF WARRANT**

TO: Overwatch Digital Health, Inc.

    1.    The undersigned hereby elects to receive _____ shares of Common Stock of Overwatch Digital Health, Inc., pursuant to the terms of the attached Warrant.

    2.    Exercise. The undersigned tenders herewith payment in full for the purchase price of the shares being purchased, together with all applicable transfer taxes, if any.

    3.    Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

       _____
           (Name)

       _____

       _____
           (Address)

    4.    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Warrant.

       _____
       Name of Purchaser

       _____
       Signature of Authorized Signatory

       _____
       Print Name and Title

       _____
       Date

## EXHIBIT 2

### WARRANT ASSIGNMENT FORM

(To be executed only upon the assignment of the within Warrant)

FOR VALUE RECEIVED, the undersigned registered Purchaser of the within Warrant hereby sells, assigns and transfers unto _____, whose address is _____ all of the rights of the undersigned under the within Warrant, with respect to shares of Common Stock (as defined within the Warrant) of Overwatch Digital Health, Inc., and, if such shares of Common Stock shall not include all the shares of Common Stock issuable as provided in the within Warrant, that a new Warrant of like tenor for the number of shares of Common Stock not being transferred hereunder be issued in the name of and delivered to the undersigned, and does hereby irrevocably constitute and appoint _____ attorney to register such transfer on the books of Overwatch Digital Health, Inc. maintained for that purpose, with full power of substitution in the premises.

Dated: _____

By: _____
(Signature of Registered Purchaser)

Title: _____

NOTICE: The signature to this Notice of Assignment must correspond with the name upon the face of the within Warrant in every particular, without alteration or enlargement or any change whatever.

11

# **EXHIBIT D**

Overwatch Unsecured Notes to Gary Snow

**CONVERTIBLE NOTE DEED**

**Overwatch Digital Health, Inc.**
**("Company")**

**Mr. Gary Snow**
**("Investor")**



DocuSign Envelope ID: 5AFC5C06-6FBD-485B-9F45-1E5A18506723

# Contents

| Clause | | | Page |
|---|---|---|---|

| **1** | **Interpretation** ..................................................................................... | **1** |
| | 1.1 | Definitions .......................................................................... | 1 |
| | 1.2 | Interpretation ...................................................................... | 4 |
| | 1.3 | Headings ............................................................................. | 5 |
| | 1.4 | Executed as a deed ........................................................... | 5 |
| **2** | **Issue of Notes** ................................................................................ | **5** |
| | 2.1 | Issue of Notes .................................................................... | 5 |
| | 2.2 | Maximum amount to be raised ........................................... | 5 |
| | 2.3 | Agreement to subscribe ..................................................... | 5 |
| | 2.4 | Payment and issue ............................................................. | 5 |
| **3** | **Notes** .............................................................................................. | **6** |
| | 3.1 | Interest ................................................................................ | 6 |
| | 3.2 | Repayment in cash ............................................................. | 6 |
| | 3.3 | Quotation ............................................................................ | 6 |
| | 3.4 | Security ............................................................................... | 6 |
| | 3.5 | Voting rights ....................................................................... | 6 |
| | 3.6 | Transferability .................................................................... | 6 |
| | 3.7 | Re-issue ............................................................................. | 6 |
| **4** | **Conversion** .................................................................................... | **6** |
| | 4.1 | Conversion into Shares ...................................................... | 6 |
| | 4.2 | Conversion entitlements ..................................................... | 6 |
| | 4.3 | Issue of Shares .................................................................. | 7 |
| | 4.4 | Effect of conversion ........................................................... | 7 |
| | 4.5 | Terms of Shares ................................................................. | 7 |
| | 4.6 | Compliance with law .......................................................... | 7 |
| | 4.7 | ASX escrow ........................................................................ | 7 |
| **5** | **Security** .......................................................................................... | **8** |
| **6** | **Indebtedness** ................................................................................. | **8** |
| | 6.1 | Acknowledgment of indebtedness ...................................... | 8 |
| | 6.2 | Satisfaction of obligations .................................................. | 8 |
| **7** | **Register** .......................................................................................... | **8** |
| | 7.1 | Establishment and maintenance ........................................ | 8 |
| | 7.2 | Holder details ..................................................................... | 8 |
| **8** | **Company warranties and undertakings** ...................................... | **8** |
| | 8.1 | Company warranties ........................................................... | 8 |
| | 8.2 | Company undertakings ....................................................... | 9 |
| | 8.3 | Reliance .............................................................................. | 10 |
| | 8.4 | Disclosure .......................................................................... | 10 |
| **9** | **Investor warranties** ...................................................................... | **10** |
| | 9.1 | Investor warranties ............................................................ | 10 |
| | 9.2 | Reliance .............................................................................. | 11 |

DocuSign Envelope ID: 5AF5F6Q6-6F69-485E-9F45-1F5A18E05798

| | | | |
|---|---|---|---|
| **10** | **Default Events** | ................................................................................ | **11** |
| | 10.1 | Default Events ............................................................. | 11 |
| | 10.2 | Power on default........................................................... | 12 |
| | | | |
| **11** | **Payments** | ...................................................................................... | **12** |
| | 11.1 | Method of payment....................................................... | 12 |
| | 11.2 | Right of set off ............................................................. | 12 |
| | | | |
| **12** | **Notices** | ........................................................................................... | **12** |
| | 12.1 | Notices in writing ......................................................... | 12 |
| | 12.2 | Method of service ......................................................... | 12 |
| | 12.3 | Addresses for service .................................................. | 12 |
| | 12.4 | Deemed receipt ............................................................ | 13 |
| | 12.5 | Facsimile transmission ................................................ | 13 |
| | | | |
| **13** | **Costs** | ................................................................................................ | **13** |
| | 13.1 | Stamp duty .................................................................... | 13 |
| | 13.2 | Costs.............................................................................. | 13 |
| | | | |
| **14** | **General** | ........................................................................................... | **13** |
| | 14.1 | Governing law and jurisdiction .................................... | 13 |
| | 14.2 | Assignment.................................................................... | 14 |
| | 14.3 | Variation........................................................................ | 14 |
| | 14.4 | Further assurances ...................................................... | 14 |
| | 14.5 | Severance ..................................................................... | 14 |
| | 14.6 | Waiver............................................................................ | 14 |
| | 14.7 | No merger...................................................................... | 14 |
| | 14.8 | Entire agreement .......................................................... | 14 |
| | 14.9 | Time of the essence ..................................................... | 15 |
| | 14.10 | Taxes and withholdings ................................................ | 15 |
| | 14.11 | Counterparts ................................................................. | 15 |
| | 14.12 | Confidentiality............................................................... | 15 |
| | 14.13 | Public announcements .................................................. | 16 |

**Schedule 1 – Term Sheet** ........................................................................... **17**

**Schedule 2 – Accession Deed** ................................................................... **17**

**Schedule 3 – Note Certificate** ................................................................... **19**

This convertible promissory note deed is dated March 04, 2019.

# Parties

**Overwatch Digital Health, Inc., a Texas corporation (and including, all of its wholly-owned subsidiaries and affiliates, collectively, the "Company"); and**

**Mr. Gary Snow residing at 8/36 Penkivil Street Bondi NSW 2026 Australia ("Investor")**

# Background

A.    The Company has developed an epilepsy management and monitoring system and has signed a binding conditional heads of agreement to undertake a reverse takeover on the ASX (**"RTO"**) to raise a minimum of $4,000,000 (AUD).

B.    The Company wishes to raise up to $1,000,000 (USD) prior to the RTO to Eligible Investors in accordance with the terms and conditions of this deed.

C.    Upon completion of the RTO, the Notes will automatically convert into Shares.

D.    Each Investor, being an Eligible Investor, agrees to subscribe for a Note on the terms and conditions of this deed.

# Agreed terms

## 1    Interpretation

### 1.1    Definitions

In this deed:

(a)    **Accession Deed** means the accession deed set out in Schedule 2;

(b)    **Act** means the United States Securities Act of 1933, as amended.

(c)    **ASX** means ASX Limited ACN 008 624 691 or the Australian Securities Exchange, as the context requires;

(d)    **Authorised Persons** means, in relation to a party:

(i)    the directors, shareholders, limited partners, general partners and their representatives, and any other person appointed to act as an authorised officer of that party;

(ii)    the employees of that party;

(iii)    the legal, financial and other advisers of that party; and

(iv)    the respective officers and employees of those legal, financial and other advisers;

(e)    **Availability Period** means the period of 3 months from the date of this deed, or such longer period determined by the Company;

(f)    **Business Day** means a day other than a Saturday, Sunday or public holiday in Dallas, Texas;

1

(g)  **Certificate of Formation** means the Certificate of Formation of the Company (as amended from time to time);

(h)  **Change in Control** means the occurrence of any one or more of the following: (i) the accumulation, whether directly, indirectly, beneficially or of record, by any individual, entity or group of 50% or more of the shares of the outstanding Shares, whether by merger, consolidation, sale or other transfer of Shares (other than a merger or consolidation where the shareholders of the Company prior to the merger or consolidation are the holders of a majority of the voting securities of the entity that survives such merger or consolidation), or (ii) a sale of all or substantially all of the assets of the Company, provided, however, that the following acquisitions shall not constitute a Change of Control for the purposes of this deed: (A) any acquisitions of Shares or securities convertible into Shares directly from the Company, or (B) any acquisition of Shares or securities convertible into Shares by any employee benefit plan (or related trust) sponsored by or maintained by the Company.

(i)  **Claim** includes any claim, demand, proceeding, suit, litigation, investigation, audit, action or cause of action in contract, tort, under statute or otherwise;

(j)  **Conversion Date** means the date on which the Company issues Shares under the Prospectus or immediately prior to a Change in Control;

(k)  **Conversion Price** means a price per Share which converts the Face Value of all the Notes into forty percent equity ownership of the Company, on a fully-diluted basis (the "Conversion Ownership Percentage"), and which is currently anticipated to be $1.50 (USD).  For purposes of clarity, the Conversion Ownership Percentage will marginally increase as a result of the conversion of interest that has accrued on the Notes.

(l)  **Corporations Act** means the Australian Corporations Act 2001 (Cth);

(m)  **Default Event** means any of the events or circumstances described in Clause 10.1;

(n)  **Eligible Investor** means a sophisticated or professional investor for the purposes of (a) section 708 of the Corporations Act and (b)Rule 501 under the Act, or any other person to whom securities can be issued without disclosure in accordance with applicable securities laws, who is invited by the Company to subscribe for Notes, including the Investor;

(o)  **Face Value** means $1,000 per each Note;

(p)  **Force Majeure Event** means an act of war (whether declared or not), hostilities, invasion, act of foreign enemies, terrorism or civil disorder in each case affecting on a general basis the business of the Company; (b) a strike or strikes or other industrial action or any other form of civil disturbance (whether lawful or not), in each case affecting on a general basis the business of the Company and the settlement of which is beyond the reasonable control of the Company; (c) earthquake or any other natural disaster of overwhelming proportions; or (d) other unforeseeable circumstances beyond the control of the Company against which it would have been unreasonable to take precautions against and which the Company cannot avoid even by using its best efforts, which in each case directly causes the Company to be unable to comply with all or a material part of its obligations under the Notes, including, without limitation, the redemption of the Notes by the Maturity Date;

(q)  **Funding Date** means, in respect of a Note, the date on which the Face Value of the Note is to be paid by the Investor to the Company, as specified in the Term Sheet;

DocuSign Envelope ID: 5AFE5D26-6F88-4858-9F45-1F5A1DF0B73B

(r)     **Government Agency** means any government or government department, any governmental, semi-governmental or judicial authority or person, any statutory body or authority or body exercising any administrative or legislative function;

(s)     **Interest End Date** means a date determined by the Company which falls within the 1-month period prior to the Lodgement Date, or in the event that the RTO does not complete, the date immediately preceding the Maturity Date;

(t)     **Investor** means an Eligible Investor who agrees to subscribe for, and to whom the Company agrees to issue, a Note in accordance with clause 2.3;

(u)     **Listing Rules** means the official listing rules of the ASX;

(v)     **Lodgement Date** the date that the Company lodges a prospectus with Australian Securities and Investments Commission for the purposes of the RTO;

(w)     **Loss** means any liability, loss, damage, judgment, cost, charge, expense, diminution in value or deficiency of any kind or character which a party pays, suffers or incurs or is liable for, however arising;

(x)     **Majority Investors** mean Investors holding Notes issued under this deed who represent at least 66.67% of the aggregate Face Value of all Notes.

(y)     **Maturity Date** means the date that is 9 months after the date of this deed unless a Force Majeure Event occurs, in which case the Maturity Date shall be extended per each Force Majeure Event but until 18 months from the date of this deed, or such later date agreed by the parties in writing;

(z)     **Monies Payable** means, in respect of a Note, at any particular time, the amount of the Face Value plus interest accrued in accordance with clause 3.1;

(aa)    **Note** means a convertible note issued by the Company under this deed;

(bb)    **Note Certificate** means a certificate in the form set out in Schedule 3;

(cc)    **Prospectus** means the prospectus to be issued by the Company to raise a minimum of $4,000,000 (AUD) under the RTO;

(dd)    **Register** means a register of holders of Notes established and maintained by the Company under Clause 7;

(ee)    **RTO** means the reverse takeover onto the ASX to be undertaken by the Company;

(ff)    **Security** means any document or transaction which reserves or creates a Security Interest;

(gg)    **Security Agreement** means the security agreement attached at Annexure A;

(hh)    **Security Interest** means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest, or any other agreement or arrangement having a similar commercial or legal effect, and includes an agreement to grant or create any of those agreements or arrangements;

(ii)    **Share** means a fully paid common share par value $0.001 (USD) each, in the capital of the Company;

(jj)    **Shareholder** means a holder of one or more Shares; and

(kk)    **Term Sheet** means a term sheet in the form set out in Schedule 1, and which document must not be inconsistent with the terms and conditions of this deed. To avoid doubt, if the Term Sheet is inconsistent with this deed then this deed prevails to the extent of the inconsistency.

## 1.2 Interpretation

In this deed, unless the context otherwise requires:

(a)    words importing the singular include the plural and vice versa;

(b)    words importing a gender include any gender;

(c)    other parts of speech and grammatical forms of a word or phrase defined in this deed have a corresponding meaning;

(d)    an expression importing a natural person includes any company, partnership, joint venture, association, corporation or other body corporate and any governmental agency;

(e)    if a party comprises two or more persons, the covenants and agreements on their part bind and shall be observed and performed by them jointly and each of them severally and may be enforced against any one or any two or more of them;

(f)    a reference to a part, clause, party, annexure, exhibit or schedule is a reference to a part and clause of, and a party, annexure, exhibit and schedule to, this deed and a reference to this deed includes any annexure, exhibit and schedule;

(g)    a reference to a statute, regulation, proclamation, ordinance or by-law includes all statutes, regulations, proclamations, ordinances or by-laws amending, consolidating or replacing it, and a reference to a statute includes all regulations, proclamations, ordinances and by-laws issued under that statute;

(h)    a reference to a document includes all amendments or supplements to, or replacements or novations of, that document;

(i)    a reference to a party to a document includes that party's successors and permitted assigns;

(j)    no provision of this deed will be construed adversely to a party solely on the ground that the party was responsible for the preparation of this deed or that provision;

(k)    a reference to an agreement other than this deed includes an undertaking, agreement, agreement or legally enforceable arrangement or understanding whether or not in writing;

(l)    a reference to a body, other than a party to this deed (including, without limitation, an institute, association or authority), whether statutory or not:

    (i)    which ceases to exist; or

    (ii)    whose powers or functions are transferred to another body,

    is a reference to the body which replaces it or which substantially succeeds to its powers or functions;

(m)    a right includes a benefit, remedy, discretion or power;

(n)    includes, including, for example or similar expressions means that expression without limitation;

(o)    Unless otherwise stated, '$' or 'USD' is a reference to the currency of the United States of America;

(p)    a reference to time is to local time in Dallas, Texas;

(q)    where the day on or by which any thing is to be done is not a Business Day, that thing must be done on or by the next Business Day; and

(r)     where time is to be calculated by reference to a day or event, that day or the day of the event is included.

## 1.3    Headings

Headings are for convenience only and do not affect the interpretation of this deed.

## 1.4    Executed as a deed

This document is executed as a deed for the purposes of the law.

# 2    Issue of Notes

## 2.1    Issue of Notes

During the Availability Period, the Company may issue Notes to Eligible Investors in accordance with the terms and conditions of this deed.

## 2.2    Maximum amount to be raised

The minimum aggregate of the Face Value of all Notes issued under this deed shall be $500,000 and the maximum shall be $1,000,000.

## 2.3    Agreement to subscribe

(a)     The Investor agrees to subscribe for, and the Company agrees to issue, the Notes specified in the Term Sheet signed by the Company and the Investor on or about the date of this deed.

(b)     During the Availability Period, If an Eligible Investor other than the Investor agrees to subscribe for a Note, and the Company agrees to issue the Note, then:

    (i)     the Eligible Investor and the Company must enter into a Term Sheet which specifies:

        (A)     the Face Value;

        (B)     the Funding Date; and

        (C)     the Maturity Date; and

    (ii)    the Eligible Investor must enter into an Accession Deed under which it agrees to be bound by this deed as if named as a party; and.

    (iii)   The Investor fills out and submits to the Company an accredited investor questionnaire which complies with Israeli law.

## 2.4    Payment and issue

(a)     Subject to clause 2.3, the Investor must pay to the Company an amount equal to the Face Value of the Note on the Funding Date in accordance with the Term Sheet.

(b)     Within 2 Business Days of receiving the Face Value in accordance with clause 2.4(a), the Company must:

    (i)     issue to the Investor the Note specified in the Term Sheet by registering the Investor as the holder of the Note in the Company Register; and

    (ii)    provide to the Investor the Note Certificate in respect of the Note issued.

# 3        Notes

## 3.1        Interest

(a)        Each Note will accrue interest at the rate of 8% per annum on the Face Value. Interest shall be calculated on the basis of a 365-day year for the actual number of days elapsed from the applicable Funding Date until the Interest End Date.

(b)        Accrued interest will form part of the Monies Payable in respect of a Note and will be repayable by the Company in cash (if clause applies 3.2) or Shares (if clause 4 applies).

## 3.2        Repayment in cash

If the Company has not completed the RTO by the Maturity Date, the Company must redeem each Note within 15 Business Days of the Maturity Date by paying the Monies Payable to the Investor.

## 3.3        Quotation

A Note will not be quoted or listed on any stock exchange.

## 3.4        Security

The Notes shall be secured on the in accordance with Clause 5 of this deed.

## 3.5        Voting rights

A Note will not provide any voting rights at Shareholder meetings of the Company or other rights as a shareholder of the Company. In the absence of conversion of this Note, no provisions of this Note, and no enumeration herein of the rights or privileges of Holder with respect to this Note, shall itself cause Holder to be a shareholder of the Company for any purpose.

## 3.6        Transferability

A Note is freely transferable subject to the Investor lodging with the Company:

(a)        a proper instrument of transfer, duly stamped if necessary, executed by the transferor and by the transferee, together with the original Note Certificate for the Note to which the transfer relates; and

(b)        an Accession Deed executed by the transferee.

## 3.7        Re-issue

A Note that is converted or redeemed in accordance with this deed will automatically be cancelled and is not available for re-issue.

# 4        Conversion

## 4.1        Conversion into Shares

Each Note (in whole) will automatically convert into Shares on the Conversion Date.

## 4.2        Conversion option

In the event of a Change in Control transaction, each Investor shall have the option immediately prior to the closing of such transaction to either: (a) convert each Note into Shares; or (b) redeem each Note for the Face Value plus accrued and unpaid Interest. The Company shall give each Investor not less than 20-days prior notice of a Change in Control transaction.

### 4.3 Optional conversion

In the event the Company consummates, while this Note remains outstanding, an equity financing pursuant to which it sells Shares in a transaction which results in total proceeds to the Company of not less than $1,000,000 (USD) (excluding conversion of the Notes) and which does not constitute an RTO, then the Investors shall have the option at such time to convert their Notes on the same terms set forth in Clause 4.4.

### 4.4 Conversion entitlements

On the Conversion Date, the Investor will be entitled to, and the Company must allot and issue to the Investor, Shares based on the following formula:

$$S = MP / CP$$

Where:

**S** is the number of Shares to be issued to the Investor;

**MP** is the Monies Payable in respect of the Note at the Conversion Date; and

**CP** is the Conversion Price.

### 4.5 Issue of Shares

On the Conversion Date, the Company must allot and issue to the Investor the full number of Shares required to be issued in accordance with Clause 4.2 (rounded up if applicable). As soon as reasonably practicable thereafter, the Company must provide to the Investor a holding statement in respect of the Shares issued to the Investor.

Upon conversion of a Note in accordance with this Clause 4, the Investor is taken to have agreed to:

(a)     subscribe for the Shares that are to be issued upon conversion of the Note;

(b)     become a Shareholder;

(c)     have its name entered in the Company's register of Shareholders; and

(d)     be bound by the Certificate of Formation.

### 4.6 Terms of Shares

Shares issued upon the conversion of a Note will rank equally in all respects with existing Shares on issue.

### 4.7 Compliance with law

Despite any other provision of this deed, if an issue of Shares under this deed would contravene the Act, Corporations Act or any other applicable laws then, to the extent such issue would contravene such law, the Company's obligation to issue the relevant securities will be deferred until such time or times as the issue of Shares would not contravene the relevant law.

### 4.8 ASX escrow

The parties acknowledge that ASX may require any or all of the Shares issued under this deed to be escrowed for a certain period of time pursuant to the Listing Rules, or otherwise as determined by the ASX. The parties agree to enter into, or procure entry into, any agreements necessary to give effect to any escrow imposed by ASX.

## 5    Security

(a)    The Notes shall be secured by the grant of a Security Interest over all of the present and future assets of the Company, including its intellectual property, in favour of the Investors in accordance with the Security Agreement.

(b)    Contemporaneously with the execution of this deed, the parties must execute the Security Agreement and, as soon as reasonably practicable, do all things necessary to register and perfect the Security Interest created under the Security Agreement.

## 6    Indebtedness

### 6.1    Acknowledgment of indebtedness

The Company acknowledges that, on and from the Funding Date of a Note, and at all times before the repayment of the Note in accordance with Clause 3.2 or the conversion of the Note in accordance with Clause 4, it will be indebted to the Investors in the amount of Monies Payable by all investors.

### 6.2    Satisfaction of obligations

The repayment of a Note in accordance with Clause 3.2 or the conversion of a Note in accordance with Clause 4, operates in full satisfaction of the Company's obligations to the Investor with respect to the Note, and the obligations of the Company with respect to the Note will be extinguished and the Note will be deemed to be cancelled.

## 7    Register

### 7.1    Establishment and maintenance

The Company must establish and maintain a register of the Notes issued by the Company under this deed.

### 7.2    Holder details

The Company must include the following information in the Register in respect of the issued Notes:

(a)    the name and address of each holder;

(b)    the certificate number of Notes held by each holder and their aggregate Face Value; and

(c)    details of all transfers, repayments, redemption and conversion of the Notes.

## 8    Company warranties and undertakings

### 8.1    Company warranties

The Company represents and warrants to the Investor:

(a)    (**status**) it is a corporation with limited liability and is properly incorporated and validly existing under the laws of the place of its incorporation;

(b)    (**shares)** that it has one class of common shares.

(c)    (**capacity**) it has full legal capacity and power to own its assets and to carry on its business as it is presently being conducted and to enter into and perform the transactions contemplated by this deed;

8

(d)    (**authority**) it has taken all corporate and other action necessary to authorise the execution and performance of this deed so that it is fully valid and binding on and enforceable against it, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(e)    (**authorisations**) all authorisations, approvals, permits, consents, filings and registrations necessary or advisable for or in connection with this deed have been obtained and are in full force and effect; and

(f)    (**no litigation**) no litigation or arbitration, administrative proceedings or other procedure for the resolution of disputes is currently taking place, pending or, to its knowledge threatened against it or its assets, revenues or business or which may have a material adverse effect on it.

## 8.2    Company undertakings

So long as the Notes are not converted or paid, the Company undertakes to the Investor:

(a)    (**maintain status**) to maintain its status as a company limited by shares incorporated under the laws of the place of its incorporation and not to transfer nor permit the transfer of its jurisdiction of incorporation;

(b)    (**comply with applicable laws**) to ensure that the Company complies with all applicable laws related to its business (including without limitation all listing rules and requirements of ASX);

(c)    (**authorisations**) to obtain, maintain and comply with any authorisations which the Company requires to carry out the transactions contemplated in, and to ensure the validity, enforceability and admissibility in evidence of, this deed in all relevant jurisdictions;

(d)    (**notice of litigation**) to give the Investor prompt notice of any litigation, arbitration or administrative proceedings whatsoever which the Company would reasonably deems to be expected to have a material adverse effect to the business of the Company;

(e)    (**inspection of records**) upon notice of not less than five business days, to permit and cause to be permitted during normal business hours, the Majority Investors, persons authorised by the Investor and any employee, agent or consultant of the Majority Investors to examine and take copies of the books of account and all other documents relating to the business or activities of the Company, whether in the possession or under the control of the Company; provided, however, that such information shall be subject to the confidentiality designations provided in this deed and provided further that such examination shall be made not more than 1 time in each calendar  quarter; Such right shall expire upon conversion of the deed to Shares.

(f)    (**notice of incorrect warranty**) to notify the Investor promptly if any representation or warranty made in this deed or undertaking taken to be made by or on behalf of the Company in connection with this deed or a Note is found to be materially incorrect or materially misleading when made or taken to be made and would reasonably deems to be expected to have a material adverse effect to the business of the Company;

(g)    (**default certificate**) on the written request of the Investor, to promptly provide the Investor with a certificate signed by an officer of the Company which states in writing whether a Default Event or event which with the giving of notice, lapse of time or fulfilment of any condition would become a Default Event continues unremedied and is not waived; and

(h)  **(board member)** to reserve one seat on the Company's board of directors for a director to be nominated by the Majority Investors.

(i)  (intellectual property) the Company owns or possesses sufficient legal rights to all of the intellectual property necessary or required to conduct its business as now conducted and as presently proposed to be conducted.  Each current and former employee and consultant of the Company has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted.

(j)  (employee and consultant agreements) each current and former employee and consultant of the Company has executed an agreement with the Company containing confidentiality, non-disclosure of the Company's proprietary information, inventions assignment, non-solicitation and non-compete provisions.  No current or former employee, consultant or officer has excluded works or inventions from his or her inventions assignment obligations to the Company.

### 8.3   Reliance

The Company acknowledges that the Investor has entered into this deed in reliance on the representations and warranties given by the Company in this deed.

### 8.4   Disclosure

The Investor acknowledges that the Company is not liable in respect of any Loss or Claim to the extent that the matter giving rise to the Loss or Claim was disclosed:

(a)  by the Company to the Investor in writing prior to the date of this deed; or

(b)  in public records dated prior to the date of this deed including searches of public registers.

## 9    Investor warranties

### 9.1   Investor warranties

The Investor represents and warrants to the Company:

(a)  (**status**) if the Investor is a Company, it is a corporation with limited liability and is properly incorporated and validly existing under the laws of its country of registration;

(b)  (**capacity**) it has full legal capacity and power to own its assets and to carry on its business as it is presently being conducted and to enter into and perform the transactions contemplated by this deed;

(c)  (**authority**) if the Investor is a Company, it has taken all corporate and other action necessary to authorise the execution and performance of this deed so that it is fully valid and binding on and enforceable against it, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(d)  (**authorisations**) all authorisations, approvals, permits, consents, filings and registrations necessary or advisable for or in connection with this deed have been obtained and are in full force and effect; and

(e)  (**exempt investor**) on the date of this deed, and on each date securities are issued under this deed, the Investor is eligible to receive an offer of, and issue of, securities under this deed in accordance with all applicable securities laws, and there is no requirement for a prospectus or any other form of disclosure document to be lodged

or registered with any Government Agency for the purposes of the Company offering or issuing securities to the Investor under this deed.

(f)  The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.  The Investor's principal place of business is correctly set forth beneath the Investor's name on the signature pages hereto.

## 9.2   Reliance

The Investor acknowledges that the Company has entered into this deed in reliance on the representations and warranties given by the Investor in this deed.

# 10   Default Events

## 10.1   Default Events

Each of the following is a Default Event:

(a)  (**other obligations**) the Company fails to comply with any provision of this deed which failure, if capable of remedy, is not remedied within 10 Business Days from the Company's receipt of notice from the Majority Investors ;

(b)  (**misrepresentation**) any representation, warranty or statement made or repeated in or in connection with this deed is untrue or misleading (whether by omission or otherwise) when so made or repeated or becomes untrue or misleading when taken as a whole and which has a material adverse effect on the Company's business;

(c)  (**involuntary winding up**) an application or order is made for the winding up of the Company or for the appointment of a liquidator and such appointment was not dismissed within 45 Business Days;

(d)  (**voluntary winding up**) the Company passes a resolution for its winding up;

(e)  (**receiver**) a receiver, controller  or analogous person is appointed to take possession of all, or any part of, the assets of the Company or a Subsidiary of the Company and such appointment was not dismissed within 30 Business Days;

(f)  (**insolvency**) the Company:

   (i)  an involuntary Insolvency proceeding is begun against the Company and not dismissed or stayed within forty-five (45) Business Days; or

   (ii)  the Company (i) is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due, or insolvent; (ii) admits its inability to pay its debts as they fall due;

(g)  (**compromise or arrangement**) the Company takes any step for the purpose of entering into a compromise or arrangement with any of its members or creditors except for the purpose of a reconstruction, amalgamation, merger or consolidation on terms approved by the Majority Investors;

(h)  (**failure to comply with waiver**) if any Default Event (or occurrence which would otherwise have been or become a Default Event) is conditionally waived by the Majority Investors and the Company does not comply with those conditions or those conditions are not fulfilled (whether by the Company or any other person) or are or become incapable of fulfilment and such non-compliance is not remedied within 10 Business Days from the Majority Investors written notice to the Company.

## 10.2 Power on default

If a Default Event occurs, the Majority Investors may, at any time during which the Default Event remains unremedied, by written notice to the Company, declare all Monies Payable to be immediately due and payable to the Investors, and the Company must immediately pay such Monies Payable to the Investors.

# 11 Payments

## 11.1 Method of payment

All payments in connection with this deed must be made:

(a) by unendorsed bank cheque payable to the party to whom the payment is due, or to any other person nominated in writing by the party to whom the payment is due, no later than 3.00pm on the due date for payment;

(b) by way of direct transfer of immediately available funds to an account nominated in writing by the party to whom the payment is due no later than 3.00pm on the due date for payment; or

(c) in such other form of immediately available funds or cleared funds as may be agreed in writing between the parties.

## 11.2 Right of set off

If any amount is payable by the Investor to the Company under this deed, the Company is entitled to set off that amount against any amount payable by the Company to the Investor under this deed.

# 12 Notices

## 12.1 Notices in writing

A notice or other communication connected with or provided under this deed does not have any legal effect unless it is in writing and in the English language.

## 12.2 Method of service

In addition to any other method of service provided by law, the notice may be:

(a) delivered by hand at the address of the addressee party set out in this deed or subsequently notified;

(b) sent by prepaid post to the address of the addressee party set out in this deed or subsequently notified;

(c) sent by facsimile to the facsimile number of the addressee party at the commencement of this deed or such other number as may be notified; or

(d) by electronic communication including email.

## 12.3 Addresses for service

(a) The authorised address of each party for service of notices is the address set opposite its name below, or such other address as the party may from time to time advise by notice to the other parties:

Overwatch Digital Health, Inc.17440 N Dallas Parkway, Suite 230
Dallas, Texas 75287
United States of America

| Attention: | Terry Fokas |
| | Chief Executive Officer |
| Facsimile: | N/A |
| Email: | terryfokas_esq@yahoo.com |

    (i)    As listed in Schedule 2

(b)    Despite clause 12.3(a), a party may also serve a notice to another party at any of the following addresses:

    (i)    for a party that is an individual, that party's principal place of residence; or

    (ii)    for a party that is a corporation:

        (A)    that party's registered office; or

        (B)    that party's principal place of business.

## 12.4   Deemed receipt

If a notice is sent or delivered in a manner provided by clause 12.2, it must be treated as given to and received by the addressee party if delivered or transmitted before 5.00pm on a Business Day in the place of receipt:

(a)    if delivered by hand, on the date of delivery;

(b)    if sent by post, on the second Business Day (at the address to which it is posted) after posting unless returned to the sender party;

(c)    if delivered by facsimile, upon the date of transmission provided that a transmission confirmation is generated by the sender party; or

(d)    if delivered by electronic communication, upon the date of transmission provided that a delivery receipt is obtained by the addressee party.

## 12.5   Facsimile transmission

A facsimile transmission is legible unless the addressee party telephones the sender party:

(a)    if during the hours of 9.00am and 5.00pm on a Business Day in the place of the addressee party, within 2 hours after transmission is received; or

(b)    if outside the hours specified in clause 12.5(a), by 11.00am on the next Business Day,

informing the sender party that it is not legible.

# 13   Costs

The Company will bear all costs (including legal costs), of and incidental to the preparation, negotiation and execution of this deed. I

## 13.1   Governing law and jurisdiction

(a)    This deed is governed by and construed in accordance with the laws of the United States and the State of Texas without regard to conflicts of laws provision.

13

**13.2**   The parties consent to the exclusive jurisdiction and venue of the state and federal courts in Collin County, Texas and agree to waive all objections to personal jurisdiction, venue and *forum non conveniens.*

(a)

### 13.3   Assignment

Subject to Clause 3.6, a party must not assign or deal with any right under this deed without the prior written consent of the other parties.  Any purported dealing in breach of this Clause 13.3  is of no effect.

### 13.4   Variation

An amendment or variation to this deed is not effective unless it is in writing and signed by the Company and the Majority Investors

### 13.5   Further assurances

Each party must sign, execute and do all deeds, acts, documents and things as may reasonably be required by the other party to effectively carry out and give effect to the terms and intentions of this deed.

### 13.6   Severance

If any provision or part of a provision of this deed is held or found by a court of competent jurisdiction to be void, invalid or otherwise unenforceable (whether in respect of a particular party or generally), it will be deemed to be severed to the extent that it is void or to the extent of voidability, invalidity or unenforceability, but the remainder of that provision will remain in full force and effect.

### 13.7   Waiver

(a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)   The exercise of a power or right does not preclude either its exercise in the future or the exercise of any other power or right.

(c)   The Majority Investors may exercise the right of waiver in relation to this deed for and on behalf of all Investors.

(d)   A waiver by a party is not effective unless it is in writing and signed by the Company and the Majority Investors.

### 13.8   No merger

Any right or obligation of any party that is expressed to operate or have effect on or after the completion, expiration or termination of this deed for any reason, does not merge on the occurrence of that event but remains in full force and effect.

### 13.9   Termination; Release of Collateral.

Upon the repayment in full of all Notes or the conversion of the Notes in accordance with the terms set forth therein, this deed shall automatically terminate, and all Security Interests shall terminate and all rights shall revert to the Company.  Upon any such termination, the Investors (following receipt of written notice of such termination from the Company) will execute and deliver to the Company at Company's expense, such documents as the Company shall reasonably request to evidence the termination of the Security Interests.

**13.10    Entire agreement**

This deed contains the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings between the parties in connection with it.

**13.11    Time of the essence**

Time is of the essence in this deed and no extension or variation of time granted by any party operates as a waiver of this clause 13.11.

**13.12    Taxes and withholdings**

The Investor understands that Investor shall be exclusively responsible for Investor's own tax liability that may arise as a result of the transactions contemplated by this deed and/or the Notes. Notwithstanding anything herein to the contrary, the Company shall be entitled to deduct and withhold from any payment payable to the Investor hereunder, such amounts as the Company is required to deduct and withhold with respect to the making of any such payment under any applicable law at the applicable rate for such withholding, unless the Company is provided with a valid tax certificate stating that no withholding, or reduced withholding, of tax is required with respect to such payment or providing any other instructions regarding tax withholding, in a form and substance reasonably acceptable to the Company, no later than five Business Days prior to the applicable date of payment thereof, in which case the taxes shall not be withheld, or shall be withheld at the applicable reduced rate and the balance of the applicable payment, as applicable, not so withheld shall be paid to the Investor.

**13.13    Counterparts**

This deed may be executed in any number of counterparts (including by way of facsimile) each of which shall be deemed for all purposes to be an original and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**13.14    Confidentiality**

Each party agrees not to disclose any information relating to another party or its business (which has been provided by any other party or which is otherwise received by a party), this deed or the terms of this deed except:

(a)    to any person in connection with an exercise of its rights or obligations imposed under this deed;

(b)    to the Authorised Persons of that party on a confidential basis;

(c)    with the consent of the party who provided the information (which consent must not be unreasonably withheld);

(d)    where the information is in the public domain as at the date of this document (provided that the party can provide written evidence to confirm this was the case) or subsequently becomes in the public domain other than by breach of any obligation of confidentiality binding on any party; or

(e)    as required by any law or required or requested by an authority such as a Government Agency, court, tribunal or recognised stock exchange, but if a party is so required or requested to make any disclosure, the relevant party must promptly notify the other party, where practicable and lawful to do so, before the disclosure occurs and must co-operate with the other party regarding the timing and content of such disclosure or any action which the other party may reasonably elect to take to challenge the validity of such requirement.

### 13.15 Public announcements

Except to the extent prevented by law and subject to clause 13.14, all investors releases or presentations relating in any way to this deed must be on terms agreed by the Company and the Majority Investors.

DocuSign Envelope ID: 5AF05E06-6FE9-485E-9F45-1E5A18E05722

# Schedule 1 – Term Sheet

March 04, 2019

Overwatch Digital Health, Inc. (the **"Company"**), a Texas corporation with its principal place of business at 17440 Dallas Parkway, Suite 230, Dallas, Texas 75287

The Investor agrees to subscribe for, and the Company agrees to issue, the following Notes on the terms and conditions of the Convertible Note Deed dated March 04, 2019 (the **"Deed"**) and this Term Sheet. The parties agree that this document constitutes a Term Sheet for the purposes of the Deed and serves as the Investor's application for the Note.

| | |
|---|---|
| **Number of Notes** | 50 (face value of $1,000 USD/Note) |
| **Aggregate Face Value** | $50,000 USD |
| **Funding Date** | March 04, 2019 |
| **Maturity Date** | November 28, 2019 |

Payment is to be made to the following bank account and otherwise in accordance with the Deed:

Account name: Overwatch Digital Health, Inc.
Bank: Plains Capital Bank P.O. Box 271, Lubbock, Texas 79408
BSB: ▮▮▮▮▮▮▮
Account No.: ▮▮▮▮▮▮▮▮▮
SWIFT code: PLASUS44

**Executed by: Mr. Gary Snow**

Authorised Representative

Gary Snow
Name of Authorised Representative

**Executed by: OVERWATCH DIGITAL HEALTH, INC.**

Terry Fokas
Chief Executive Officer

17

DocuSign Envelope ID: 5AF6E5D26-6F89-4858-9F45-1F5A18E0B733

# Schedule 2 – Accession Deed

March 04, 2019

To:       **Overwatch Digital Health, Inc.** (the **"Company"**)

From:  **Mr. Gary Snow residing at 8/36 Penkivil Street Bondi NSW 2026 Australia** (the **"Investor"**)

Dear Sirs

1.      We refer to the Convertible Note Deed dated March 04, 2019 (the **"Deed"**), of which we confirm we have received a copy.  This deed will take effect as an Accession Deed for the purposes of the Deed.  Unless the context requires, capitalised terms defined in this deed have the meaning given in the Deed.

2.      Mr. Gary Snow agrees to become an Investor and to be bound by the terms and conditions of the Deed, and the relevant Term Sheet, as an Investor with effect from the date of this deed.

3.      Mr. Gary Snow's notice details for the purposes of the Deed and the Register are as follows:

Address:       8/36 Penkivil Street Bondi NSW 2026 Australia
Attention:      Mr. Gary Snow

Facsimile:

Email:          garysnow52@gmail.com

4.      This deed is governed by and construed in accordance with the laws of the United States and the State of Texas without regard to conflicts of laws provisions.  The parties submit to the exclusive jurisdiction ofthe state and federal courts in Collin County, Texas and agree to waive all objections to personal jurisdiction, venue and *forum non conveniens* and any courts which may hear appeals from those courts in respect of any proceedings in connection with this deed.

**Executed as a deed.**

**Executed by: Mr. Gary Snow**

DocuSigned by:

Authorised Representative

Gary Snow
Name of Authorised Representative

18

# Schedule 3 – Note Certificate

## OVERWATCH DIGITAL HEALTH, INC.

## Note Certificates

## Certificate Numbers: 668 – 718

Head Office/Note Registry: 17440 Dallas Parkway, Suite 230, Dallas, Texas 75287 USA

This is to certify that Mr. Gary Snow, an individual residing at 8/36 Penkivil Street Bondi NSW 2026 Australia is the registered holder of the Notes specified below which was issued on March 04, 2019.

The Notes confer on the Investor the rights, power and privileges set out in, and is subject to the terms and conditions of, the Convertible Note Deed dated March 04, 2019 between the Company and the Investor.

| | |
|---|---|
| **Number of Notes** | 50 (face value of $1,000/Note) |
| **Aggregate Face Value** | $50,000.00 USD |
| **Funding Date** | March 04, 2019 |
| **Maturity Date** | November 28, 2019 |

**Executed by OVERWATCH DIGITAL HEALTH, INC., a Texas corporation:**

DocuSigned by:

*Terry Fokas*

79CB899D2514FA...

**Terry Fokas**
**Chief Executive Officer**

19

**Executed as a deed.**

**Executed by OVERWATCH DIGITAL
HEALTH, INC., a Texas corporation:**

DocuSigned by:

*Terry Fokas*

E9C6373C3B2514FA...

**Terry Fokas**
**Chief Executive Officer**

**Executed by Mr. Gary Snow:**

DocuSigned by:

EE48DF06457E41B...

DocuSign Envelope ID: 15AF5E026-6F92-485E-9F45-1F5A19E05722

Annexure A – Security Agreement

[Provided Under Separate Cover]

# **EXHIBIT E**

Overwatch 2019 Audited Financials Describing Obligations to Petitioning Creditors in Note 6

CONFIDENTIAL INFORMATION

# Overwatch Digital Health, Inc.

CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 2019

**Overwatch Digital Health, Inc.**

CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 2019

TABLE OF CONTENTS

|  | Page |
|---|---|
| **REPORT OF INDEPENDENT AUDITORS** | 2-3 |
| **CONSOLIDATED FINANCIAL STATEMENT - U.S. DOLLARS ($):** |  |
| Consolidated statement of financial position | 4 |
| Consolidated statement of profit and loss | 5 |
| Consolidated statement of changes in equity | 6 |
| Consolidated statement of cash flows | 7 |
| Notes to consolidated financial statements | 8-18 |



# INDEPENDENT AUDITORS' REPORT

To the Shareholder of Overwatch Digital Health, Inc.

## Opinion

We have audited the consolidated financial statements of Overwatch Digital Health, Inc. and its subsidiary (the "Company"), which comprise the consolidated statement of financial position as of December 31, 2019, and the consolidated statements of profit and loss, changes in equity (deficit) and cash flows for the period from January 7, 2019 (inception) through December 31, 2019, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2019, and its financial performance and its cash flows for the period then ended in accordance with International Financial Reporting Standards ("IFRS").

## Basis for Opinion

We conducted our audit in accordance with International Standards on Auditing ("ISAs"). Our responsibilities under those standards are further described in the *Auditor's Responsibilities for the Audit of the Financial Statements* section of our report. We are independent of the Company in accordance with the ethical requirements of the International Ethics Standards Board for Accountants' *Code of Ethics for Professional Accountants*, and we have fulfilled our other ethical responsibilities in accordance with these requirements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## Material Uncertainty Related to Going Concern

We draw attention to Note 2 of the consolidated financial statements, which indicates that the Company incurred a net loss of $1,772,520 during the period ended December 31, 2019 and, as of that date, the Company's current liabilities exceeded its total assets by $1,907,845. As stated in Note 2, these events or conditions, along with other matters as set forth in Note 2, indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern. Our opinion is not modified in respect of this matter.

## Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRS and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing the Company's ability to continue as a going concern and using the going concern basis of accounting unless management either intends to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Company's financial reporting process.

**Auditor's Responsibilities for the Audit of the Consolidated Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion.  Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

*KMJ Corbin & Company LLP*

KMJ Corbin & Company LLP

Costa Mesa, California
February 6, 2020

**Overwatch Digital Health, Inc.**
CONSOLIDATED STATEMENT OF FINANCIAL POSITION

|  | Note | December 31, 2019 U.S. Dollars |
|---|---|---|
| **A s s e t s** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | | $    45,411 |
| **T O T A L  CURRENT ASSETS** | | 45,411 |
| **NON CURRENT ASSETS:** | | |
| Property and equipment, net | 3 | 2,313 |
| Note receivable | 4 | 251,219 |
| **T O T A L  ASSETS** | | $    298,943 |
| **Liabilities and  equity (deficit)** | | |
| **CURRENT LIABILITIES:** | | |
| Trade payables | | $    64,311 |
| Other accounts payable | 5 | 61,110 |
| Notes payable, including interest accrued | 6 | 1,827,835 |
| **T O T A L  CURRENT LIABILITIES** | | 1,953,256 |
| **STOCKHOLDER'S EQUITY (DEFICIT):** | | |
| Issued capital | 7 | 1 |
| Other equity | 7 | 118,206 |
| Accumulated losses | | (1,772,520) |
| **T O T A L  EQUITY (DEFICIT)** | | (1,654,313) |
| **T O T A L  LIABILITIES AND EQUITY (DEFICIT)** | | $    298,943 |

Date of approval of financial statements February 6, 2020.

_Terry Fokas_                              _Terry Fokas_
**Chairman**                              **Director**

**The accompanying notes are an integral part of these consolidated financial statements**.

**Overwatch Digital Health, Inc.**
CONSOLIDATED STATEMENT OF PROFIT AND LOSS

|  | Note | For the period January 7(*), 2019 through December 31, 2019 |
|---|---|---|
|  |  | **U.S. Dollars** |
| **OPERATING EXPENSES:** |  |  |
| Research and development | 8 | $ 352,155 |
| Sales and marketing | 9 | 220,859 |
| General and administrative | 10 | 657,527 |
| **OPERATING LOSS** |  | 1,230,541 |
| **FINANCIAL EXPENSES,** net | 11 | 203,118 |
| **OTHER LOSS** | 12 | 338,861 |
| **NET LOSS BEFORE INCOME TAXES** |  | 1,772,520 |
| **TAX ON INCOME** |  | - |
| **NET LOSS FOR THE YEAR** |  | $ 1,772,520 |

(*) Incorporation date

**The accompanying notes are an integral part of these consolidated financial statements.**

**Overwatch Digital Health, Inc.**
CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

| | Number of Shares | Share Capital | Other Equity | Accumulated Losses | Total |
|---|---|---|---|---|---|
| Balance as of January 7, 2019(*) | - | - | - | - | - |
| Issuance of common shares | 1,000 | $1 | - | - | $1 |
| Value of conversion rights attributed from convertible notes | - | - | $107,790 | - | 107,790 |
| Value of warrants attributed from promissory notes | - | - | 10,416 | - | 10,416 |
| Net loss | - | - | - | ($1,772,520) | (1,772,520) |
| Balance as of December 31, 2019 | 1,000 | $1 | $118,206 | ($1,772,520) | ($1,654,313) |

(*) Incorporation date

**The accompanying notes are an integral part of these consolidated financial statements.**

**Overwatch Digital Health, Inc.**
CONSOLIDATED STATEMENT OF CASH FLOWS

| | For the period January 7(*), 2019 through December 31, 2019 |
|---|---|
| | **U.S. Dollars** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Loss for the year | $(1,772,520) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation | 27 |
| Other loss | 338,861 |
| Interest on convertible promissory notes and promissory notes | 97,952 |
| Interest on note receivable | (1,219) |
| Amortization of interest of convertible promissory notes and promissory notes associated with equity allocation | 105,089 |
| Convertible notes received in exchange for consulting services | 40,000 |
| Changes in operating assets and liabilities items: | |
| Increase in trade payables | 64,311 |
| Increase in other accounts payable | 3,815 |
| Net cash used in operating activities | (1,123,684) |
| | |
| **CASH FLOWS FROM INVESTMENT ACTIVITIES:** | |
| Purchase of property and equipment | (2,340) |
| Payments for intellectual property asset purchase | (281,565) |
| Promissory notes granted | (250,000) |
| Net cash used in investing activities | (533,905) |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Proceeds from issuance of promissory notes and convertible notes | 1,703,000 |
| Net cash provided by financing activities | 1,703,000 |
| | |
| **INCREASE IN CASH AND CASH EQUIVALENTS** | 45,411 |
| **BALANCE OF CASH AND CASH EQUIVALENTS AT THE BEGINNING OF THE PERIOD** | - |
| **BALANCE OF CASH AND CASH EQUIVALENTS AT THE END OF PERIOD** | $45,411 |
| | |
| **Non-cash financing activity** | |
| Issuance of shares | $1 |

(*) Incorporation date.

**The accompanying notes are an integral part of these consolidated financial statements**.

7

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1 – GENERAL INFORMATION:

### a. General

Overwatch Digital Health, Inc. (Hereinafter: the "Company") was originally incorporated in Texas as SAE Digital Health, Inc. on 7 January 2019. On 1 February 2019, a certificate of amendment was filed with the Texas Secretary of State to change the entity name from SAE Digital Health, Inc. to Overwatch Digital Health, Inc.

The Company develops and markets a proprietary epilepsy monitoring, detecting and alerting software application designed to dramatically improve the lives of individuals living with epilepsy and their caregivers and to provide seizure event information to doctors so they can effectively design epilepsy treatment options for their patients. In addition, the Company's seizure detection application collects and stores seizure event data so that doctors can remotely review seizure information in order to adjust patients' treatment protocols or to design new treatment options. The Company's seizure detection application is slated for consumer release between late-February and mid-March 2020 and will be available for download on its website and on the Apple App Store.

The Company holds a fully owned subsidiary (Hereinafter: the "Subsidiary") called Highline Innovation Investment Partnership, LLC which was incorporated on January 24, 2019 under the laws and regulations of the State of Texas.
The consolidated financial statements were authorized for issue by the directors on February 6, 2020. The directors have the power to amend and reissue the consolidated financial statements.

## NOTE 2 – BASIS OF PREPARATION

### a. Going concern basis of accounting

The consolidated financial statements have been prepared on a going concern basis, which assumes that the Company will be able to meet the mandatory repayment terms of its liabilities.

In making this assessment, management conducted a comprehensive review of the consolidated entity's affairs, including, but not limited to:
• The consolidated entity's financial position for the financial year ended 31 December 2019;
• Significant events and transactions the consolidated entity has entered into since 31 December 2019;
• The cash flow forecast for the consolidated entity for the next 12 months; and
• The continued support of the consolidated entity's shareholder and lenders.

Management also considered the impact of maturity during 2020 of the convertible notes and promissory notes with a face value of $1,043,000 and $700,000 respectively.

Unless those convertible notes are converted to shares by the holders prior to maturity, the principal and interest outstanding on maturity will be payable in cash by the consolidated entity. Management are confident of gaining shareholder and lenders' support in relation to this matter.

A fundamental component of the ability to continue as a going concern is the consolidated entity's ability raise to additional funding through capital or debt. The Company is in the process of entering into an agreement to reverse merge into a publicly traded Australian entity and raise AUD $7 million to AUD $10 million.

As at 31 December 2019 the consolidated entity's current liabilities exceeded current assets by $1,907,845. For the financial period ended 31 December 2019 the consolidated entity incurred

loss after income tax of $1,772,520 and net cash outflows from operating activities of $1,123,684.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 2 – BASIS OF PREPARATION (continued)

### a. Going concern basis of accounting (continued)

In making its assessment, management acknowledges that the ability of the consolidated entity to continue as a going concern is dependent on the positive cash flows, the continued support of shareholder and lenders, the conversion of the notes to shares and the raising of additional share capital and/or debt when required in the future.

### b. Compliance with IFRS

The consolidated financial statements of the Company have been prepared in accordance with International Financial Reporting Standards (IFRS) and interpretations issued by the IFRS Interpretations Committee (IFRS IC) applicable to companies reporting under IFRS. The financial statements comply with IFRS as issued by the International Accounting Standards Board (IASB).

### c. Use of judgments and estimates

In preparing these consolidated financial statements, management has made judgments and estimates that affect the application of the Company's accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to estimates are recognized prospectively.

Significant estimates made by the Company include the collectability of the note receivable and the estimated fair value of the compound financial instruments.

### d. Historical cost convention

The consolidared financial statements have been prepared on a historical cost basis, and where applicable, financial assets and liabilities at fair value.

### e. Impact of new accounting standards

The Company has applied the following standard and amendments for the first time for their annual reporting period commencing 7 January 2019:
- IFRS 16 Leases
The new Standard introduces three main changes:
  - Enhanced guidance on identifying whether a contract contains a lease;
  - A completely new leases accounting model for lessees that require lessees to recognize all leases on balance sheet, except for short-term leases and leases of low value assets; and
  - Enhanced disclosures.
Impact: The Company has assessed the impact of the new leasing standard and concluded there will be no change to the accounting treatment for short-term leases less than 12 months which will continue to be expensed on a straight-line basis.

### f. Functional and presentation currency

Items included in the consolidated financial statements of each of the Company's entities are measured using the currency of the primary economic environment in which the entity

operates ('the functional currency'). The consolidated financial statements are presented in United States Dollars ($), which is the Company's functional and presentation currency.

**Overwatch Digital Health, Inc.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2 – BASIS OF PREPARATION (contined)**

g.  **Basis of consolidation**

The consolidated financial statements comprise the financial statements of the Company and the subsidiary. In preparing the consolidated financial statements, all intercompany transactions, balances and unrealized gains on transactions between entities in the Company are eliminated. The subsidiary is consolidated from the date on which control is obtained to the date on which control is disposed.

h.  **Cash and cash equivalents**

For the purpose of presentation in the consolidated financial statements of cash and cash equivalents includes cash on hand.

i.  **Trade payables**

Trade payables are recognized initially at the amount of consideration that is unconditional, unless they contain significant financing components when they are recognized at fair value.

j.  **Research and development expenses**

Research and development expenses are charged to the statement of profit and loss for the period as incurred.

k.  **Compound financial instruments**

Compound financial instruments issued by the Company comprise of the following:
▪   Convertible promissory notes issued by the Company denominated in United States Dollars which can be converted to common shares upon the occurrence of an event allowing conversion, as defined within the agreement.
▪   Promissory notes and warrants agreement denominated in United States Dollars. The agreement grants the investors warrants to purchase shares of the Company's common stock at an exercise price of $1.56. The warrants are exercisable for a term of five years. Each maturity date grants the investor a different ceiling of warrants which can be purchased on that date.

The liability component of compound financial instruments is initially recognized at the fair value of a similar liability that does not have an equity conversion option. The equity component is initially recognized at the difference between the fair value of the compound financial instrument as a whole and the fair value of the liability component. Any directly attributable transaction costs are allocated to the liability and equity components in proportion to their initial carrying amounts.

Subsequent to initial recognition, the liability component of a compound financial instrument is measured at amortized cost using the effective interest method. The equity component of a compound financial instrument is not remeasured.

Interest related to the financial liability is recognized in profit and loss. On conversion at maturity, the financial liability is reclassified to equity and no gain or loss is recognized.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2 – BASIS OF PREPARATION (continued)**

    **l.  Fair value of financial instruments**

        The carrying amount of some of the Company's financial instruments, including cash equivalents, accounts payable and accrued liabilities approximate their fair value, due to their short maturities.

        Loans and borrowings are recognized at their fair value of the consideration received, net of transaction costs.

    **m.  Income tax**

        The income tax expense or credit for the period is the tax payable on the current period's taxable income, based on the applicable income tax rate for each jurisdiction, adjusted by changes in deferred tax assets and liabilities attributable to temporary differences and to unused tax losses.

        The current income tax charge is calculated on the basis of the tax laws enacted or substantively enacted at the end of the reporting period in the countries where the Company and its subsidiaries and associates operate and generate taxable income. Management periodically evaluates positions taken in tax returns with respect to situations in which applicable tax regulation is subject to interpretation. It establishes provisions, where appropriate, on the basis of amounts expected to be paid to the tax authorities.

        Deferred income tax is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the consolidated financial statements.

        Deferred income tax is determined using tax rates (and laws) that have been enacted or substantially enacted by the end of the reporting period and are expected to apply when the related deferred income tax asset is realized or the deferred income tax liability is settled.
Deferred tax assets are recognized only if it is probable that future taxable amounts will be available to utilize those temporary differences and losses.

        The Company has not recognized any deferred tax asset as of December 31, 2019.

        Current and deferred tax is recognized in profit and loss, except to the extent that it relates to items recognized in other comprehensive income or directly in equity.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 3 - PROPERTY AND EQUIPMENT

**Recognition and measurement:**
The carrying value of property and equipment is measured as the cost of the asset, less depreciation and impairment. Costs include purchase price, other directly attributable costs and the initial estimate of the costs of dismantling and restoring the asset, where applicable.

**Depreciation:**
The depreciable amount of all property and equipment is depreciated on a straight-line method from the date that management determine that the asset is available for use.

Items of equipment are depreciated using the cost model, depreciated on a straight-line basis over their useful lives. The cost model is where the asset is carried at its cost less any accumulated depreciation and any Impairment losses. The estimated useful life of office furniture by the Company is 7 years.

|  | December 31, 2019 |
| --- | --- |
|  | U.S. Dollars |
| Cost - | |
| Office Furniture | $2,340 |
| L e s s - Accumulated depreciation: | 27 |
|  | $2,313 |

Depreciation expense totaled to $27 for the period ended December 31, 2019.

## NOTE 4 – NOTE RECEIVABLE:

|  | December 31, 2019 | | |
| --- | --- | --- | --- |
|  | U.S. Dollars | | |
|  | Principal | Interest | Total |
| Promissory note | 250,000 | 1,219 | 251,219 |

On 2 August 2019, the Company issued a promissory note for a maximum amount of drawn downs of $200,000 in a schedule of four dated transactions of $50,000 each. The notes carry an annual interest of 2% and commence on the date of each drawdown. The unpaid principal along with the accrued interest shall be due and payable in full on 31 January 2021.

The note can be converted into shares in the event of sale agreement prior to February 1, 2020 according to the definitions and conditions defined in the note and at the discretion of the Company. Price per share for the conversion is based on a valuation amount determined within the note and the shares shall have the same rights and privileges as the most senior class of existing securities The promissory note was amended on 7 December, 2019 to a maximum amount of $400,000 to be drawn down in a schedule of eight transactions of $50,000 each and additional $100,000 transaction reimbursement amount. In addition the date of the sale agreement was amended to 31 March 2020.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 5 – OTHER ACCOUNTS PAYABLE:**

Other accounts payable is composed of the following:

|  | December 31, 2019 |
|---|---|
|  | U.S. Dollars |
| Customers' deposits | $3,815 |
| Provision for payments to creditor under intellectual property assets purchase agreement | 57,295 |
|  | $61,110 |

**Customers' deposits**
The Company offered a promotional pre-launch offer including an Apple series 3 watch and three months Overwatch seizure-monitoring service. Payments from costumers were received during November and December while the delivery of the product is planned for February 2020.

**Provision for payments to creditor under intellectual property assets purchase agreement**
This amount is a provision for additional payments to creditors according to the intellectual property assets purchase agreement of the Company's subsidiary. See Note 12 for further details.

A provision is recognized when the Company has a present (legal or constructive) obligation as a result of a past event, it is probable the Company will be required to settle the obligation, and a reliable estimate can be made of the amount of the obligation. The amount recognized as a provision is the best estimate of the consideration required to settle the present obligation at the reporting date, taking into account the risks and uncertainties surrounding the obligation.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 6 – NOTES PAYABLE, INCLUDING INTEREST ACCRUED

The following provides information about the contractual terms of the Company's interest-bearing loans and borrowings.

| | December 31, 2019 | | | | |
| | U.S. Dollars | | | | |
| | Principal | Allocated to equity | Amortization | Interest accrued | Total |
| Convertible promissory notes | $1,043,000 | $(107,790) | $100,359 | $69,131 | $1,104,700 |
| Promissory notes | 700,000 | (10,416) | 4,730 | 28,821 | 723,135 |
| | $1,743,000 | $(118,206) | $105,089 | $97,952 | $1,827,835 |

The Company raised an aggregated amount of $1,043,00 in convertible promissory notes from 26 investors during the months February-April 2019.

The convertible promissory notes carry an interest of 8% per annum to be paid in cash or shares at the interest maturity date. The maturity date of the convertible promissory notes is nine months after the date of the deed and was extended to 1 May 2020.

In the event of change of control transaction as defined in the agreement, each investor shall have the option immediately or prior to closing of such transaction either to convert the note into shares or redeem each note for the face value plus accrued interest. Conversion price was anticipated to be $1.50 at the notes' issuance date and equity ownership of forty percent of the Company.

In the event of completion of a reverse takeover on the Australian Securities Exchange to raise a minimum of $4,000,000, the convertible promissory notes will automatically convert into shares of common stock.

In the event the Company consummates, while these convertible promissory notes remain outstanding, an equity financing pursuant to which it sells shares of common stock in a transaction which results in total proceeds to the Company of not less than $1,000,000 (excluding conversion of the notes) and which does not constitute a reverse takeover, then the investors shall have the option at such time to convert their convertible promissory notes into shares of common stock.

If the Company shall not complete such transaction by the maturity date, it must redeem each note within 15 business days.

The Company granted and pledged a security interest to the investors of the convertible promissory note in all of the Company's right, title and interest in, to and under intellectual property.

The Company also raised $700,000 in promissory notes and warrant agreements from two investors during the period September-December 2019. The promissory notes carry an interest of 10% per annum if payment is on or before the first maturity date, 20% per annum if payment is on or before the second maturity date and 25% per annum from the overdue date and up until the amounts are paid in full. The second maturity date of the notes is 4 April 2020.

15

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 6 – NOTES PAYABLE, INCLUDING INTEREST ACCRUED (contined)**

The agreement also grants the investors warrants to purchase shares of the Company's common stock at an exercise price of $1.56. The warrants are exercisable for a term of five years. Each maturity date grants the investor a different ceiling of warrants which can be purchased on that date.

The liabilities were recognized at the fair value of similar liabilities that do not have an equity conversion option and measured at amortized cost using the effective interest method. The equity components were recognized at the difference between the fair value of each compound financial instrument as a whole and the fair value of each liability component. The equity component is not remeasured. Interest related to the financial liabilities are recognized in profit or loss.

**NOTE 7 – EQUITY**

**ORDINARY SHARES**

As of December 31, 2019, 1,000 common shares of $0.001 par value each were issued to a sole holding shareholder.

**OTHER EQUITY**

|  | Note | December 31, 2019 |
|---|---|---|
|  |  | **U.S. Dollars** |
| Value of conversion rights attributed from convertible notes | (I) | $107,790 |
| Warrants attributed from promissory notes | (II) | 10,416 |
|  |  | $118,206 |

(I)   The amount shown as conversion rights is the value of the conversion rights relating to the convertible notes, details of which are shown in note 6.

(II)   The amount shown as warrants is the value of the warrants relating to the promissory notes and warrants agreement, details of which are shown in note 6.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 8 – RESEARCH AND DEVELOPMENT**

|  | For the period January 7(*), 2019 through December 31, 2019 |
| --- | --- |
|  | U.S. Dollars |
| Consultants | $325,114 |
| Consumable materials and other expenses | 27,041 |
|  | $352,155 |

(*) Incorporation date.

**NOTE 9 – SALES AND MARKETING**

|  | For the period January 7(*), 2019 through December 31, 2019 |
| --- | --- |
|  | U.S. Dollars |
| Marketing and advertising | $52,000 |
| Consultants | 168,859 |
|  | $220,859 |

(*) Incorporation date.

**NOTE 10 – GENERAL AND ADMINISTRAIVE**

|  | For the period January 7(*), 2019 through December 31, 2019 |
| --- | --- |
|  | U.S. Dollars |
| Professional expenses | $482,951 |
| Travel and entertainment | 94,783 |
| Office expenses | 35,323 |
| Rent and related expenses | 44,443 |
| Depreciation | 27 |
|  | $657,527 |

(*) Incorporation date.

17

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 11 – FINANCIAL EXPENSES, net**

|  | For the period January 7(*), 2019 through December 31, 2019 |
|---|---|
|  | **U.S. Dollars** |
| **Finance income** |  |
| Interest accrued on promissory note | $(1,219) |
| **Finance expenses** |  |
| Interest accrued on convertible promissory note issued | 69,131 |
| Interest accrued on promissory note issued | 28,821 |
| Amortization of interest on promissory note related to equity allocation | 4,730 |
| Amortization of interest on convertible note related to equity allocation | 100,359 |
| Bank charges | 1,296 |
|  | $203,118 |

(*) Incorporation date.

**NOTE 12 – OTHER LOSSES**

|  | For the period January 7(*), 2019 through December 31, 2019 |
|---|---|
|  | **U.S. Dollars** |
| Impairment of intellectual property assets purchased | $338,861 |

(*) Incorporation date.

On February 11, 2019, the Company's subsidiary entered into an agreement to acquire the intellectual property of Biolert, Ltd ("Biolert"). As part of this agreement, the Company's subsidiary paid to Biolert's creditors an aggregated amount of $281,565. Subsequent to these payments, the Company determined that Biolert's claims regarding its intellectual property were not substantiated and that the Company's own proprietary technology was more accurate than the technology covered by Biolert's intellectual property. As a result, the Company's subsidiary terminated the agreement and made a demand to Biolert for the return of the $281,565 paid to Biolert's creditors. To date, Biolert has not responded to this demand.

The Company's management assessment is that the intellectual asset does not have an economic value and therefore the asset was fully impaired.

**Overwatch Digital Health, Inc.**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 13 – OTHER DISCLOSURE

**RELATED PARTY TRANSACTIONS**

The table below provides key management personnel, or their related parties, compensation:

|  | For the period January 7(*), 2019 through December 31, 2019 |
| --- | --- |
|  | U.S. Dollars |
| Payment to CEO, including expenses reimbursements and health insurance | $251,675 |
| Payment to CEO's family, including expenses reimbursements | 85,682 |
| Payments to company owned by CEO | 4,000 |
|  | $341,357 |

## NOTE 14 – GUARANTIES AND COLLATERAL

The Company granted and pledged a security interest to the investors of the convertible promissory note in all of the Company right, title and interest in, to and under intellectual property.

## NOTE 15 – LEGAL MATTERS

From time to time, in the normal course of its operations, the Company may be a party to litigation and other dispute matters and claims. Litigation can be expensive and disruptive to normal business operations. Moreover, the results of complex legal proceedings are difficult to predict. An unfavorable outcome to any legal matter, if material, could have a materially adverse effect on the Company's operations or its financial position, liquidity or results of operations. As of 31 December 2019, there were no pending or threatened lawsuits or claims that could reasonably be expected to have a material effect on the Company's consolidated financial position or consolidated results of operations

## NOTE 16 – SUBSEQUENT EVENTS

The Company issued in January 2020 convertible notes for an aggregated amount of $250,000 carrying an 8% interest per annum. The maturity date of the notes is 1 June 2020. Upon a reverse takeover of a publicly traded Australian entity the notes and its unpaid interest will automatically be converted into shares of the Australian entity. The notes can be extended by the majority of the holders up until 1 December, 2020 and if the notes are still outstanding by the extended maturity date then they will be converted to the Company's common stock. Within thirty days of the issuance of the notes, the noteholders shall receive an option to purchase one share of the Company for every three shares due upon conversion of the note.

***

## **EXHIBIT F**

Email from Terry Fokas, CEO of Overwatch, Dated 24 August 2020

## R.J. Shannon

| | |
|---|---|
| **From:** | Terry Fokas <terry.fokas@overwatchdh.com> |
| **Sent:** | Monday, August 24, 2020 6:17 PM |
| **To:** | Barrett Clive; Emmanuel Correia |
| **Subject:** | FW: ODH - No response on Invoice email |

Clive, Manny:

The email below is from Overwatch's sole remaining developer who we pay $5,000/month (which is very cheap for a full-time developer). We are three months behind (June/July/August) in paying his invoices. Soon to be four months (September). Waqas is the only developer we have left who knows the Overwatch App codebase and if we lose him we will not be able to fix the problems that we invariably experience on a regular basis with the monitoring, detecting and alerting functionality.

I'm also getting emails like this every day from other vendors (both in Israel and in the United States) who we promised to pay in August or September and I (and Eran) can't give them any response on when or if we'll be able to pay them (telling them that additional funding is contingent upon ASX listing approval will not be well received).

The reason I'm telling you all this is because I don't want you guys to be blindsided by the status of the companies: Overwatch is at a very critical juncture (as is BioEye) and if we don't raise money soon we will seriously have to consider shutting down operations in the next 2-3 weeks.

Clive had recently brought up the idea of going to Adam/Rision and asking them to raise money for us. Is there anything that can be done with Rision in this regards? FYI, I reached out twice to Philip Currie (who, I understand, is a significant shareholder in Rision) and he's ignored my outreach.

Terry

**From:** Stephanie Fokas <stephanie.fokas@overwatchdh.com>
**Sent:** Monday, August 24, 2020 6:00 PM
**To:** Terry Fokas <terry.fokas@overwatchdh.com>
**Subject:** Fw: ODH - No response on Invoice email

FYI from Waqas.

**From:** Waqas Arsalan <waqas.arsalan@overwatchdh.com>
**Sent:** Monday, August 24, 2020 1:44 PM
**To:** Stephanie Fokas <stephanie.fokas@overwatchdh.com>
**Cc:** Arsalan O16 Labs <arsalan@o16-labs.com>; Waqas O16 Labs <waqas@o16-labs.com>
**Subject:** ODH - No response on Invoice email

Hello **Stephanie**, Is everything alright?

We've not received any response on July '20 Invoice while June '20 still unpaid.

Can you please update when will these invoices will clear?

Kind Regards,

**Waqas**

## **EXHIBIT G**

Email from Terry Fokas, CEO of Overwatch, Dated 1 September 2020

## R.J. Shannon

| | |
|---|---|
| **From:** | Terry Fokas <terry.fokas@overwatchdh.com> |
| **Sent:** | Tuesday, September 1, 2020 7:14 AM |
| **To:** | Adam Sierakowski |
| **Cc:** | Steve Rosich; Emmanuel Correia |
| **Subject:** | Re: Danny Frawley was suffering from chronic brain disease when he died |

Understood Adam and I appreciate your efforts.

Given where we are financially, I'll lay off remaining staff off today. Also, with a 14 day delay to obtaining any funding, we won't be able to complete the audits for Overwatch and BioEye within the timeline you distributed recently.

Both are regrettable but we don't have any funds in the bank so we have to start winding our business operations down until/unless the funding situation changes in the very near future.

Best,
Terry


Get Outlook for iOS

---

**From:** Adam Sierakowski <adam@tridentcapital.com.au>
**Sent:** Tuesday, September 1, 2020 7:03:37 AM
**To:** Terry Fokas <terry.fokas@overwatchdh.com>
**Cc:** Steve Rosich <steve.rosich7@gmail.com>; emmanuel.correia@pelotoncapital.com.au
<emmanuel.correia@pelotoncapital.com.au>
**Subject:** Re: Danny Frawley was suffering from chronic brain disease when he died
Thanks Terry,

Appreciate the update. I spoke to Manny yesterday and he requested whether RNL would be able to attract funding into OTL.

I said potentially but these fund raising endeavours at best take at least 14 days in introducing the opportunity, discussing the investment instrument and explaining the risks investing in a US company.

To be honest 50% chance at this stage.

Adam Sierakowski
Trident Capital


> On 1 Sep 2020, at 19:57, Terry Fokas <terry.fokas@overwatchdh.com> wrote:
>
>
> No update, Adam. We shut down Eympact in March to conserve funds. In May, Clive advised me to have a product ready for sidelines use by 31 July so we started burning funds on that endeavor. We shut down that effort in early July when Steve and the AFL told us that it was unlikely we would be able to work together this season.

No news or updates either from the University or Cincinnati which has been shut down through the summer due to COVID-19.

On a different topic I presume you were not able to confirm that any Rision investors would make an investment into Overwatch? If that assumption is correct please let me know? I will have to terminate all remaining staff in the US today so I don't incur personal liability for their September salaries.

Also, if we can't confirm additional funding by next week, it is unlikely that the audits for either company will be completed by the end of this month.

Best,
Terry

Get Outlook for iOS

**From:** Adam Sierakowski <adam@tridentcapital.com.au>
**Sent:** Tuesday, September 1, 2020 5:54:33 AM
**To:** Steve Rosich <steve.rosich7@gmail.com>
**Cc:** emmanuel.correia@pelotoncapital.com.au <emmanuel.correia@pelotoncapital.com.au>; Terry Fokas <terry.fokas@overwatchdh.com>
**Subject:** Re: Danny Frawley was suffering from chronic brain disease when he died
Terry,

Is there an update on the OTL concussion status.

I have been approached by Australian journalists regarding the status of the technology.

Adam Sierakowski
Trident Capital

On 1 Sep 2020, at 06:22, Steve Rosich <steve.rosich7@gmail.com> wrote:

Gents,

This is big news in Melbourne today:

Danny Frawley was suffering from chronic brain disease when he died

https://www.theage.com.au/sport/afl/danny-frawley-was-suffering-from-chronic-brain-disease-when-he-died-20200831-p55r3k.html

## **<u>EXHIBIT H</u>**

Email from Terry Fokas, CEO of Overwatch, Dated 12 October 2020

**R.J. Shannon**

| | |
|---|---|
| **From:** | Terry Fokas <terry.fokas@overwatchdh.com> |
| **Sent:** | Monday, October 12, 2020 12:14 PM |
| **To:** | Clive Barrett |
| **Cc:** | Emmanuel Correia |
| **Subject:** | RE: Overwatch |

Clive,

As I previously noted to you on our last call and to Manny on a call with him several weeks ago, there is no interest from prospective investors to invest the time, money and effort in the necessary due diligence to make a determination on whether to invest in Overwatch while the promissory notes and the convertible promissory notes remain outstanding. This issue is exacerbated by the fact that Overwatch has no employees, no development work being undertaken and a rapidly shrinking subscriber base as well as the current amount of company's trade and vendor obligations which are in excess of USD $500,000.

I'm happy to provide you (or any other noteholder) with our calendar year 2020 QuickBooks files provided we first have a non-disclosure agreement in place. If you need specific financial statements prepared from Overwatch's 2020 QuickBooks files, I can put you in touch with Brooks-Keret (they prepared our 2019 audited finacials and they were in the process of preparing the stub 2020 audited financials) which will advise you on the cost of preparing such financials statements.

There is no interest from prospective investors to buy out now the convertible note holders particularly, given the lack of a functioning company and the debt issues I noted above.

As I've noted in previous emails and discussions, we had to have the conversion issue resolved by 15 October so that I could raise funding (I've been personally loaning money to Overwatch since July to continue service its subscriber base and I don't have the ability to continue paying the company's expenses).

Given the delay in getting your (non) response below and the lack of clarity on how to move forward, we've unfortunately have run out of time and runway. I recently retained Judith Ross as Overwatch's bankruptcy counsel so I'll interface with her tomorrow (today is a holiday in the U.S.) so she can begin the process of filing for bankruptcy. Going forward, have your legal counsel interface directly with Harvey Bines on corporate matters and with Judith Ross on bankruptcy-related matters.

I'll draft and disseminate a letter to all noteholders this week advising them of the ASX's decision to deny our application for listing as well as Overwatch's decision to file for bankruptcy. I'll also let Adam Sierakowski and Steve Rosich (respectively, as legal counsel and Chairman of the Board for Rision, Ltd) know that Overwatch is filing for bankruptcy and that they need to make the necessary public and regulatory filings and notifications that the Overwatch-Rision transaction has been terminated.

I've copied below the contact information for Harvey Bines and Judith Ross which you should forward to your corporate and/or insolvency counsel.

Regards,
Terry

Harvey Bines
Sullivan & Worcester, LLP

Office: (617) 338-2828
Email: hbines@sullivanlaw.com

Judith Ross
Ross & Smith, PC
Office: (214) 377-7879
Emaill: Judith.ross@judithross.com

---

**From:** Clive Barrett <Clive.Barrett@fcfg.com.au>
**Sent:** Sunday, October 11, 2020 11:21 PM
**To:** Terry Fokas <terry.fokas@overwatchdh.com>
**Cc:** Manny Correia <Emmanuel.Correia@pelotoncapital.com.au>
**Subject:** Overwatch

Hi Terry

Good to talk with you.

We've spoken with all Con Note holders and the unanimous feedback is they are not in a position to consider whether to convert or to seek repayment of their monies, without at least a plan for the business/company being outlined for their consideration. Providing the up to date financials of the company would also be helpful.

Alternatively, the people/groups who have expressed interest in investing in Overwatch can make an offer to buy out the Con Note holders. This may be a sensible, as well as the simplest solution.

Regards

Clive

On 4 Oct 2020, at 12:03 am, Terry Fokas <terry.fokas@overwatchdh.com> wrote:

Hi Clive,

Thanks for the update regarding your discussions with the BioEye shareholders. Happy to talk with you and Manny so we can make the necessary arrangements about how to move forward.

One point I wanted to flag in advance of our discussion was an issue that Manny had raised in a recent call regarding a global license to BioEye of Overwatch's technology. As you know, Overwatch can be utilized commercially worldwide in the epilepsy market and my recent discussions with prospective U.S. investors have included funding for global epilepsy marketing and product-support initiatives. If you or Manny have ideas for independent epilepsy distribution in specific markets, such as Australia, or, as Manny seemed to indicate, you wish to

2

explore adapting Overwatch's technology to other movement disorders or tremor-afflictions, that could be of interest. In either case, we might usefully explore ways which help you complete the Rision transaction with BioEye (including, providing my personal assistance as might be reasonably necessary or useful to getting BioEye listed on the ASX).

Whatever we decide to do about Rision, BioEye and the ASX, it would be helpful to understand your current objectives better and how you think they should be addressed. I look forward to seeing a proposal from you or Manny enough in advance of our call for me to be fully responsive. The more specific you can be, the more productive our discussion will be.

Finally, I have asked Harvey Bines to be on the line when we speak since we'll need to draw up the necessary legal documents to memorialize the arrangement to move forward and Harvey will be papering the U.S. side of whatever we agree on. Of course, especially if we will be discussing ways to enable a Rision/BioEye offering in Australia, you should consider having your counsel attend that call as well.

When you (or Manny) send these proposals, please also let me know what days/times work best for you guys (and your legal counsel) for a call and I'll synch up with Harvey on his availability.

Best,
Terry

---

**From:** Clive Barrett <Clive.Barrett@fcfg.com.au>
**Sent:** Tuesday, September 29, 2020 7:32 AM
**To:** Terry Fokas <terry.fokas@overwatchdh.com>
**Cc:** Emmanuel Correia <Emmanuel.Correia@pelotoncapital.com.au>
**Subject:** OVerwatch

Hi Terry

Good to talk with you a few days ago. I've now had a chance to speak with all BioEye shareholders, something I Indicated I'd be doing.

The clear consensus is to keep the company independent, to focus on meeting it's day to day commitments and to maintain its private status until there's a change in the economic landscape.

As suggested by Manny in a previous email, all options will be considered until the most suitable path emerges. It's definitely best that your discussions/negotiations on Overwatch with investors and other parties be limited to Overwatch. From our perspective, any kind of sensible commercial arrangements between Overwatch and BioEye will be considered and encouraged.

Moss and I are agreeable to Manny's suggestion about swapping our loans to Overwatch with a loan to BioEye. This would offset the loan from Overwatch to BioEye and provide a clean solution to the current loan obligations for both companies.

Please let Manny and I know when's best to talk again so that we can make the necessary arrangements to move forward.

Regards

Clive

## **EXHIBIT I**

Notice of Default and Demand for Payment



Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Phone: 713-715-1660
www.parkinslee.com

## Parkins Lee & Rubio LLP
### Attorneys and Counselors at Law

Lenard M. Parkins | lparkins@parkinslee.com | Direct: 713-715-1666

## NOTICE OF DEFAULT & DEMAND FOR PAYMENT

June 1, 2021

Via U.S.P.S. and email: terryfokas_esq@yahoo.com

Overwatch Digital Health, Inc.
c/o Terry Fokas, Esq.
17440 Dallas Parkway
Suite 230
Dallas, TX 75287

>        Re: Convertible Note Deeds and Note Certificates (together, the "Convertible Notes")
> among Overwatch Digital Health, Inc. n/k/a Overwatch Digital Technologies, Inc.
> ("Borrower") and certain investors indicated in Exhibit A hereto (the "Investors") and the
> related Security Interest Agreement (the "Security Agreement") dated April 10, 2019, among
> Borrower and Mr. Clive Barrett (the "Trustee")

Dear Mr. Fokas:

Our firm represents the Trustee in his role as trustee under the Security Agreement for the Investors, and as attorney in fact for the Investors indicated in Exhibit B hereto who represent approximately 78% of the aggregate Face Value of the Convertible Notes (the "Majority Investors") with respect pursuing collection under the Convertible Notes.

This letter is formal notice that the Borrower has failed to comply with Section 3.2 of the Convertible Note Deeds as the result of the failure of the Borrower to redeem each of the Convertible Notes within 15 Business Days of the Maturity Date by paying the Monies Payable to each Investor.[1]

As of June 1, 2021, the total amount due under the Convertible Notes is $1,106,904.42 USD. The Trustee hereby demands that the Borrower pay each Investor the Monies Payable to such Investor within 10 Business Days of the date of this letter. If payment or other adequate arrangement is not made within 10 Business Days, the Trustee reserves the right to take all appropriate steps to obtain recovery for the Investors and Majority Investors.

Please make the payments required by the Convertible Notes to the Majority Investors via the wire instructions attached hereto as Exhibit C or directly to the noteholder. The following Investors

---

[1] Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Convertible Notes.

June 1, 2021
Page 2 of 2

have not authorized the Trustee to receive payment on their behalf and thus Overwatch will need to arrange for payment directly to such parties separately:

Adiel Moyal
Aegoz 2 B Ashqelon, Israel
Email: adielmoyal@gmail.com

Mr. Richard Peter Dowle
172 Williams St Gooseberry Hill WA 6076
Email: conceit2@bigpond.com

John Funchess & John Funchess Jr.
J & L Funchess Super Fund A/C
PO Box 1645 West Perth WA 6872
Email: funchess@bigpond.com

Bingopolous Super Fund
PO Box 1645 West Perth WA 6872
Attention Todd Stiles & Rachel Daniels
Email: john@jagilfillan.com.au

Simon & Robyn Melville
S & R Melville Super Fund A/C
32A Scott St South Fremantle WA 6162
Email: simon@roofing2000.com.au

Joel Bines
6031 Norway
Dallas, Texas 75230

Glenda & Matt Lazzarich
Glenmatt Super Fund A/C
PO Box 1645 West Perth WA 6872
Email: john@jagilfillan.com.au

Big Fish Mandurah Quay Pty Ltd
Suite 12, One The Esplanade Mount Pleasant
WA 6153
Email: admin@gilfillan.com.au

If you have any questions or would like to discuss, do not hesitate to reach out to the undersigned and/or my colleague R. J. Shannon. Our respective emails are lparkins@parkinslee.com and rshannon@parkinslee.com. We hope to hear from you soon.

For the avoidance of doubt, the Trustee and the Majority Investors reserve all rights and remedies under law and equity and waive none.

Sincerely,

Lenard M. Parkins

Enclosures.

**EXHIBIT A - ALL INVESTORS AND PAYABLE AMOUNTS**

Interest rate     8%

Interest Accrued Date   1-Jun-21

| | Face Value | Note Date | Note #'s | Interest Days | Interest Accrued | Total Due |
|---|---|---|---|---|---|---|
| Colepin ATF Barrett and Sons Trading Co Super Fund<br>Attention: Mr. Clive Barrett<br>Address: c/o Quantum Partners, Level 1, 95-97 Grafton<br>Email: clive@colpin.com | $50,000 | 2/15/2019 | 1 – 500 | 837 | $9,173 | $59,173 |
| Colepin ATF Barrett and Sons Trading Co Super Fund<br>Attention: Mr. Clive Barrett<br>Address: c/o Quantum Partners, Level 1, 95-97 Grafton<br>Email: clive@colpin.com | N/A--Interest Remaining after setoff | 2/15/2019 | 1-500 | 837 | $82,553 | $82,553 |
| HT Barrett Family Trust<br>Attention: Mr. Steven Barrett<br>Address: c/o Balance & Co., U3B Level 3, 5 Belmore<br>Email: steven.barrett@fcfg.com.au | $50,000 | 2/19/2019 | 501-551 | 833 | $9,129 | $59,129 |
| Onn Dodis<br>Address: Avshalom 5 Rishon Le Zion, Israe<br>Email: onn@boxofdreams.org | $28,000 | 2/19/2019 | 552 – 580 | 833 | $5,112 | $33,112 |
| Adiel Moyal<br>Address: Aegoz 2 B Ashqelon, Israel<br>Email: adielmoyal@gmail.com | $28,000 | 2/19/2019 | 581 – 609 | 833 | $5,112 | $33,112 |
| Guy Duani<br>Address: Nahum Sokolov 32 Tel Aviv, Israel<br>Email: guy.duani@gmail.com | $27,970 | 2/20/2019 | 610 – 638 | 832 | $5,101 | $33,071 |
| Alon Lavie<br>Address: 2013 Sombrero Palm, Ocean Village Mews,<br>Email: lavie.alone@gmail.com | $28,000 | 2/21/2019 | 639 – 667 | 831 | $5,100 | $33,100 |
| Gary Snow<br>Address: 8/36 Penkivil Street Bondi NSW 2026<br>Email: garysnow52@gmail.com | $50,000 | 3/4/2019 | 668 – 718 | 820 | $8,986 | $58,986 |
| LAW Investment Holdings Pty Ltd ATF LAW<br>Address: 8 Eldorado Street Colebee NSW 2761<br>Email: ndrew.walker@firstclassfs.com.au | $7,000 | 3/4/2019 | 719 – 726 | 820 | $1,258 | $8,258 |
| Walker Family Superfund Pty Ltd ATF Walker Family<br>Address: 8 Eldorado Street Colebee NSW 2761<br>Email: ndrew.walker@firstclassfs.com.au | $7,000 | 3/4/2019 | 727 – 734 | 820 | $1,258 | $8,258 |
| Praha Nominees Pty Ltd.<br>Jag Unit A/C<br>Address: PO Box 1645, West Perth WA 6872<br>Email: john@jagilfillan.com.au | $35,000 | 3/15/2019 | 735 – 770 | 809 | $6,206 | $41,206 |
| Mill Point Consulting Pty Ltd<br>39/44 Kings Park Rd West Perth WA 6872<br>Email: admin@gilfillan.com.au | $14,000 | 3/15/2019 | 771 – 785 | 809 | $2,482 | $16,482 |
| Leigh Mackinnor<br>54 View St East Fremantle WA 6158<br>Email: leighmackinnon@gmail.com.au | $17,000 | 3/15/2019 | 786 – 803 | 809 | $3,014 | $20,014 |
| Ashikaga Pty Ltd<br>The Rowe Superannuation Fund<br>Suite 7, 16 Nicholson Rd, Subiaco WA 6008<br>Email: | $7,000 | 3/15/2019 | 804 – 811 | 809 | $1,241 | $8,241 |
| John Funchess & John Funchess Jr.<br>J & L Funchess Super Fund A/C<br>PO Box 1645 West Perth WA 6872<br>Email: funchess@bigpond.com | $10,000 | 3/15/2019 | 812 – 822 | 809 | $1,773 | $11,773 |
| Simon & Robyn Melville<br>S & R Melville Super Fund A/C<br>32A Scott St South Fremantle WA 6162<br>Email: simon@roofing2000.com.au | $10,000 | 3/15/2019 | 823 – 833 | 809 | $1,773 | $11,773 |
| Glenda & Matt Lazzarich<br>Glenmatt Super Fund A/C<br>PO Box 1645 West Perth WA 6872<br>Email: john@jagilfillan.com.au | $7,000 | 3/15/2019 | 834 – 841 | 809 | $1,241 | $8,241 |
| Kruger Park Pty Ltd.<br>PO Box 1305, Double Bay NSW 1360 Australia<br>Attention: Allan Zior<br>Email: azion@shawandpartners.com.au | $75,000 | 3/20/2019 | 842 – 917 | 804 | $13,216 | $88,216 |
| Mr. Richard Peter Dowle<br>172 Williams St Gooseberry Hill WA 6076<br>Email: conceit2@bigpond.com | $7,000 | 3/22/2019 | 918 – 925 | 802 | $1,230 | $8,230 |
| Jed International P/L<br>Unit 39, 44 Kings Park Rd West Perth WA<br>Attention: Ms. Susan Calton<br>Email: admin@gilfillan.com.au | $23,000 | 3/22/2019 | 926 – 949 | 802 | $4,043 | $27,043 |

Case 21-41504    Doc 1-1    Filed 10/25/21    Entered 10/25/21 11:07:17    Desc  Compiled

| Investor | Amount | Date | Cert. Numbers | | | |
|---|---|---|---|---|---|---|
| Bingopolous Super Func<br>PO Box 1645 West Perth WA 6872<br>Attention Todd Stiles & Rachel Daniels<br>Email: john@jagilfillan.com.au | $7,000 | 3/22/2019 | 950 – 957 | 802 | $1,230 | $8,230 |
| L & S Fenton Superannuation Fund<br>PO Box 65 Beaconsfield Upper,<br>Victoria, 3808.<br>Trustee for the Super Fund. L A Fenton Pty Ltd., ACN<br>Attention: Laurie Fenton<br>Email: laurie@fentonsolutions.com.au | $15,000 | 4/10/2019 | 958 – 973 | 783 | $2,574 | $17,574 |
| T&N ALABAKIS Superannuation Func<br>Address: 28 Loma Street. Cottesloe,<br>Western Australia 6011<br>Trustee for the Super Fund Kenze Pty Ltd, ACN: 167<br>Attention: Tom Alabakis<br>Email: alabakis@bigpond.com | $15,000 | 4/10/2019 | 974 – 989 | 783 | $2,574 | $17,574 |
| Assunta Tarulli<br>88 Lawley Crescent<br>Mt Lawley, Western Australia 6050<br>Attention: Nino Tarull<br>Email: ntarulli@gmail.com | $15,000 | 4/10/2019 | 990 – 1005 | 783 | $2,574 | $17,574 |
| Mrs. Louise Jane Hartwig<br>16 Tasman Street<br>Bondi NSW 2026<br>Attention: Shane Hartwig<br>Email: shane.hartwig@pelotoncapital.com.au | $10,000 | 4/10/2019 | 1006 – 1016 | 783 | $1,716 | $11,716 |
| Cardrona Energy Pty Ltd<br>29 Loma Street, Cottesloe WA 6011<br>Attention: Emanuel Correia<br>Email: Emmanuel.correia@pelotoncapital.com.au | $10,000 | 4/10/2019 | 1017 – 1027 | 783 | $1,716 | $11,716 |
| Peloton Advisory Pty Ltd<br>Level 5, 56 Pitt Street, Sydney NSW 2000<br>Attention: Emmanuel Correia<br>Email: Emmanuel.correia@pelotoncapital.com.au | $40,000 | 4/10/2019 | 1028 – 1068 | 783 | $6,865 | $46,865 |
| | **$592,970.00** | | | | **$188,253** | **$781,223** |

| Investor<br>(Name, Address & Email) | Amount of Investment | Date of Investment | Convertible Note<br>Certificate<br>Numbers | | | |
|---|---|---|---|---|---|---|
| Joel Bines<br>6031 Norway<br>Dallas, Texas 75230 | $50,000.00 | 3/30/2020 | 1898 – 1948 | 428 | $4,690 | $54,690 |
| Joel Bines<br>6031 Norway<br>Dallas, Texas 75230 | $50,000.00 | 4/22/2020 | 1949 – 1999 | 405 | $4,438 | $54,438 |
| Mossco Capital (Luxembourg) SARL<br>6 Rue Eugene Ruppert Luxembourg<br>Attention: Wayne Abramsohn<br>Email: wa@rosefin.com | $162,500.00 | 5/7/2020 | 2000 – 2163 | 390 | $13,890 | $176,390 |
| Mill Point Consulting Pty Ltd<br>39/44 Kings Park Rd West Perth WA 6872<br>Email: admin@gilfillan.com.au | $5,000.00 | 5/7/2020 | 2164 – 2169 | 390 | $427 | $5,427 |
| Ashikaga Pty Ltd<br>The Rowe Superannuation Fund<br>Suite 7, 16 Nicholson Rd, Subiaco WA 6008<br>Email: | $7,000.00 | 5/4/2020 | 2170 – 2177 | 393 | $603 | $7,603 |
| Big Fish Mandurah Quay Pty Ltd<br>Suite 12, One The Esplanade Mount Pleasant WA<br>Email: admin@gilfillan.com.au | $25,000.00 | 5/8/2020 | 2178 – 2203 | 389 | $2,132 | $27,132 |
| | **$299,500.00** | | | | | **$325,681** |

**Total Con Note  and A1 Face Value:**     **$892,470**          **Total Amount Outstanding:**   **$1,106,904.42**

**EXHIBIT B - MAJORITY INVESTORS AND PAYABLE AMOUNTS**

| | | Interest Accrued Date | | | | |
|---|---|---|---|---|---|---|
| Interest rate | | 8% | 1-Jun-21 | | | |

| | Face Value | Note Date | Note #'s | Interest Days | Interest Accrued | Total Due |
|---|---|---|---|---|---|---|
| Colepin ATF Barrett and Sons Trading Co Super Fund<br>Attention: Mr. Clive Barrett<br>Address: c/o Quantum Partners, Level 1, 95-97 Grafton<br>Email: clive@colpin.com | $50,000 | 2/15/2019 | 1 – 500 | 837 | $9,173 | $59,173 |
| Colepin ATF Barrett and Sons Trading Co Super Fund<br>Attention: Mr. Clive Barrett<br>Address: c/o Quantum Partners, Level 1, 95-97 Grafton<br>Email: clive@colpin.com | N/A - Interest after setoff | 2/15/2019 | 1-500 | 837 | $82,553 | $82,553 |
| HT Barrett Family Trust<br>Attention: Mr. Steven Barrett<br>Address: c/o Balance & Co., U3B Level 3, 5 Belmore<br>Email: steven.barrett@fcfg.com.au | $50,000 | 2/19/2019 | 501-551 | 833 | $9,129 | $59,129 |
| Onn Dodis<br>Address: Avshalom 5 Rishon Le Zion, Israel<br>Email: onn@boxofdreams.org | $28,000 | 2/19/2019 | 552 – 580 | 833 | $5,112 | $33,112 |
| Guy Duani<br>Address:  Nahum Sokolov 32 Tel Aviv, Israel<br>Email: guy.duani@gmail.com | $27,970 | 2/20/2019 | 610 – 638 | 832 | $5,101 | $33,071 |
| Alon Lavie<br>Address:  2013 Sombrero Palm, Ocean Village Mews,<br>Email: lavie.alone@gmail.com | $28,000 | 2/21/2019 | 639 – 667 | 831 | $5,100 | $33,100 |
| Gary Snow<br>Address: 8/36 Penkivil Street Bondi NSW 2026<br>Email: garysnow52@gmail.com | $50,000 | 3/4/2019 | 668 – 718 | 820 | $8,986 | $58,986 |
| LAW Investment Holdings Pty Ltd ATF LAW<br>Address: 8 Eldorado Street Colebee NSW 2761<br>Email: ndrew.walker@firstclassfs.com.au | $7,000 | 3/4/2019 | 719 – 726 | 820 | $1,258 | $8,258 |
| Walker Family Superfund Pty Ltd ATF Walker Family<br>Address: 8 Eldorado Street Colebee NSW 2761<br>Email: ndrew.walker@firstclassfs.com.au | $7,000 | 3/4/2019 | 727 – 734 | 820 | $1,258 | $8,258 |
| Praha Nominees Pty Ltd.<br>Jag Unit A/C<br>Address: PO Box 1645, West Perth WA 6872<br>Email: john@jagilfillan.com.au | $35,000 | 3/15/2019 | 735 – 770 | 809 | $6,206 | $41,206 |
| Mill Point Consulting Pty Ltd<br>39/44 Kings Park Rd West Perth WA 6872<br>Email: admin@gilfillan.com.au | $14,000 | 3/15/2019 | 771 – 785 | 809 | $2,482 | $16,482 |
| Leigh Mackinnon<br>54 View St East Fremantle WA 6158<br>Email: leighmackinnon@gmail.com | $17,000 | 3/15/2019 | 786 – 803 | 809 | $3,014 | $20,014 |
| Ashikaga Pty Ltd<br>The Rowe Superannuation Fund<br>Suite 7, 16 Nicholson Rd, Subiaco WA 6008<br>Email: | $7,000 | 3/15/2019 | 804 – 811 | 809 | $1,241 | $8,241 |
| Kruger Park Pty Ltd.<br>PO Box 1305, Double Bay NSW 1360 Australia<br>Attention: Allan Zion<br>Email: azion@shawandpartners.com.au | $75,000 | 3/20/2019 | 842 – 917 | 804 | $13,216 | $88,216 |
| Jed International P/L<br>Unit 39, 44 Kings Park Rd West Perth WA<br>Attention: Ms. Susan Calton<br>Email: admin@gilfillan.com.au | $23,000 | 3/22/2019 | 926 – 949 | 802 | $4,043 | $27,043 |
| L & S Fenton Superannuation Fund<br>PO Box 65 Beaconsfield Upper,<br>Victoria, 3808.<br>Trustee for the Super Fund. L A Fenton Pty Ltd., ACN<br>Attention: Laurie Fenton<br>Email: laurie@fentonsolutions.com.au | $15,000 | 4/10/2019 | 958 – 973 | 783 | $2,574 | $17,574 |
| T&N ALABAKIS Superannuation Fund<br>Address: 28 Loma Street. Cottesloe,<br>Western Australia 6011<br>Trustee for the Super Fund Kenze Pty Ltd, ACN: 167<br>Attention: Tom Alabakis<br>Email: alabakis@bigpond.com | $15,000 | 4/10/2019 | 974 – 989 | 783 | $2,574 | $17,574 |
| Assunta Tarulli<br>88 Lawley Crescent<br>Mt Lawley, Western Australia 6050<br>Attention: Nino Tarulli<br>Email: ntarulli@gmail.com | $15,000 | 4/10/2019 | 990 – 1005 | 783 | $2,574 | $17,574 |

| | Amount | Date | Certificate Numbers | | | |
|---|---|---|---|---|---|---|
| Mrs. Louise Jane Hartwig<br>16 Tasman Street<br>Bondi NSW 2026<br>Attention: Shane Hartwig<br>Email: shane.hartwig@pelotoncapital.com.au | $10,000 | 4/10/2019 | 1006 – 1016 | 783 | $1,716 | $11,716 |
| Cardrona Energy Pty Ltd<br>29 Loma Street, Cottesloe WA 6011<br>Attention: Emanuel Correia<br>Email: Emmanuel.correia@pelotoncapital.com.au | $10,000 | 4/10/2019 | 1017 – 1027 | 783 | $1,716 | $11,716 |
| Peloton Advisory Pty Ltd<br>Level 5, 56 Pitt Street, Sydney NSW 2000<br>Attention: Emmanuel Correia<br>Email: Emmanuel.correia@pelotoncapital.com.au | $40,000 | 4/10/2019 | 1028 – 1068 | 783 | $6,865 | $46,865 |
| **$523,970.00** | | | | | **$175,893** | **$699,863** |

| Investor<br>(Name, Address & Email) | Amount of Investment | Date of Investment | Convertible Note Certificate Numbers | | | |
|---|---|---|---|---|---|---|
| Mossco Capital (Luxembourg) SARL<br>6 Rue Eugene Ruppert Luxembourg<br>Attention: Wayne Abramsohn<br>Email: wa@rosefin.com | $162,500.00 | 5/7/2020 | 2000 – 2163 | 390 | $13,890 | $176,390 |
| Mill Point Consulting Pty Ltd<br>39/44 Kings Park Rd West Perth WA 6872<br>Email: admin@gilfillan.com.au | $5,000.00 | 5/7/2020 | 2164 – 2169 | 390 | $427 | $5,427 |
| Ashikaga Pty Ltd<br>The Rowe Superannuation Fund<br>Suite 7, 16 Nicholson Rd, Subiaco WA 6008<br>Email: | $7,000.00 | 5/4/2020 | 2170 – 2177 | 393 | $603 | $7,603 |
| **$174,500.00** | | | | | | **$189,421** |

**Total Con Note  and A1 Face Value:**     **$698,470**          **Totoal Amount Outstanding:**     **$889,283.60**

**EXHIBIT C - WIRE INSTRUCTIONS**

## Parkins Lee & Rubio LLP
## IOLTA Client Trust Account
## Wire Instructions

JPMorgan Chase Bank, N.A.
dba Chase Bank
8 East Pkwy, Scarsdale, NY 10583

Account Number ▮▮▮▮▮
ABA Number ▮▮▮▮▮
(*For international transfers*:  CHASUS33)

*For the benefit of*:
Parkins Lee & Rubio LLP
IOLTA Client Trust Account
700 Milam, Suite 1300
Houston, Texas 77002